UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| POSCO, | ) <br> ) <br> ) |
| Plaintiff, | ) <br> ) Court No. 16-00225 |
| v. | ) <br> ) |
| UNITED STATES, | ) <br> ) |
| Defendant. | ) <br> ) |

## COMPLAINT

POSCO ("Plaintiff") by and through counsel, alleges herein as follows:

## JURISDICTION

1. Plaintiff brings this action pursuant to Sections 516A(a)(2)(A)(i) and 516A(a)(2)(B)(i) of the Tariff Act of 1930, *as amended* ("the Act"), 19 U.S.C. §§ 1516a(a)(2)(A)(i) and (a)(2)(B)(i). This action is an appeal of the U.S. Department of Commerce's ("Commerce") amended final determination in the countervailing duty ("CVD") investigation covering cold-rolled steel flat products from Korea. *See Countervailing Duty Investigation of Certain Cold-Rolled Steel Flat Products From the Republic of Korea: Final Affirmative Determination*, 81 Fed. Reg. 49,943 (Dep't Commerce July 29, 2016), amended by *Certain Cold-Rolled Steel Flat Products from Brazil, India, and the Republic of Korea: Amended Final Affirmative Countervailing Duty Determination and Countervailing Duty Order (the Republic of Korea) and Countervailing Duty Orders (Brazil and India)*, 81 Fed. Reg. 64,436 (Dep't Commerce Sept. 20, 2016) ("*Amended Final Determination* and *Order*").

2. This Court has jurisdiction by reason of 28 U.S.C. § 1581(c).

1

## STANDING

3. Plaintiff is a producer and exporter of cold-rolled steel from Korea.

4. Plaintiff was a party to the underlying CVD investigation and participated in the investigation by filing questionnaire responses, participating in verification, filing case and rebuttal briefs, and filing ministerial error comments. Therefore, Plaintiff is an "interested party" pursuant to 19 U.S.C. § 1516a(f)(3) and 19 U.S.C. § 1677(9)(A). As an "interested party" that actively participated in the proceeding below, Plaintiff has standing to commence this action under 19 U.S.C. § 1516a(a)(2)(A), 19 U.S.C. § 1516a(d), 28 U.S.C. § 2631(c), and 28 U.S.C. § 1581(c).

## TIMELINESS OF THIS ACTION

5. On September 20, 2016, Commerce published in the *Federal Register* the challenged *Amended Final Determination* and *Order*. Plaintiff filed a summons initiating this appeal on October 20, 2016, pursuant to Sections 516A(a)(2)(A)(i)(II) and 516A(a)(2)(B)(i) of the Act, 19 U.S.C. § 1516a(a)(2)(A)(i)(II) and (B)(i), which was within thirty (30) days of publication of the *Amended Final Determination* and *Order* in the *Federal Register*. This action was therefore timely filed pursuant to 19 U.S.C. § 1516a(a)(2)(A)(i)(II), 28 U.S.C. § 2636(c), and Court of International Trade Rule 3. This complaint is being filed on November 14, 2016, which is within 30 days of the filing of the summons and is thus timely under Court of International Trade Rule 3(a)(2).

## STATEMENT OF FACTS

6. On July 28, 2015, the domestic industry filed a petition with Commerce and the U.S. International Trade Commission alleging, *inter alia*, that Korean cold-rolled steel producers were receiving unlawful subsidies from the Government of Korea ("GOK"). Commerce initiated

2

a CVD investigation on August 17, 2015. Commerce selected POSCO and Hyundai Steel as the mandatory respondents on September 15, 2015 and issued the initial questionnaire to both mandatory respondents on September 16, 2015.

7. As part of its initial questionnaire, Commerce asked a series of questions about any companies that are affiliated with POSCO to determine if they may be considered to be "cross-owned" with POSCO. According to the instructions in the questionnaire, which conform to Commerce's regulations: "Cross-ownership exists between two companies where one company can use or direct the individual assets of another company in essentially the same ways it can use its own assets. Normally, such a relationship exists between two companies where one company holds, directly or indirectly, a majority voting interest in the other." *See also* 19 C.F.R. § 351.525(b)(6)(vi). The questions regarding cross-ownership were asked in order to determine if there were any POSCO affiliated companies that may be required to submit complete questionnaire responses so that Commerce could attribute any subsidy received by the cross-owned affiliate to the combined sales of POSCO and the cross-owned affiliate.

8. According to the instructions in the questionnaire, POSCO needed to submit a complete questionnaire response for those affiliates where "cross-ownership" exists and also where one of the following situations applies: (1) the cross-owned company produces the subject merchandise; or (2) the cross-owned company is a holding company or a parent company (with its own operations) of the respondent; or (3) the cross-owned company supplies an input product for production of the downstream product produced by the respondent; or (4) the cross-owned company has received a subsidy and transferred it the respondent. These four situations come straight from Commerce's attribution regulations. 19 C.F.R. § 351.525(b)(6)(ii) thru (v). However, with regard to situation (3), the regulations also provide that production of the input

3

product must be "*primarily dedicated* to the production of the downstream product . . . ." *Id.* at (b)(6)(iv) (emphasis added).

9. The *Preamble* to Commerce's CVD regulations provides additional guidance regarding the attribution of subsidies received by cross-owned input suppliers to the respondent company and the "primarily dedicated" requirement. Specifically, the *Preamble* states that, in cases where input suppliers provide inputs that are "dedicated almost exclusively to the production of a higher value added product . . . {,} the purpose of a subsidy provided to the input producer is to benefit the production of both the input and downstream products." *Countervailing Duties: Final Rule*, 63 Fed. Reg. 65,348, 65,401 (Nov. 25, 1998) ("*Preamble*"). Such subsidies should thus be attributed to the respondent company. However, where inputs are not "primarily dedicated" to the production of downstream products, Commerce noted that "it is not reasonable to assume that the purpose of a subsidy to the input product is to benefit the downstream product," and therefore subsidies received by cross-owned input suppliers whose inputs are not primarily dedicated to the production of the downstream product should not be attributed to respondent companies. *Id*.

10. In order to determine whether products are "primarily dedicated" to the production of the downstream product and, therefore, determine whether any benefits received by input suppliers should be attributed to the responding company, Commerce in some of its recent cases has evaluated whether these inputs represent a significant part of the cross-owned affiliates' total sales. *See, e.g.*, *Large Residential Washers From the Republic of Korea: Final Affirmative Countervailing Duty Determination*, 77 Fed. Reg. 75,975 (Dep't Commerce Dec. 26, 2012), and accompanying Issues and Decision Memorandum at 3. If the inputs provided to the

respondent accounted for an insignificant amount of the input producer's total sales, then Commerce did not attribute any subsidies received by the input producer to the respondent. *Id.*

11. POSCO submitted its response to the affiliation and cross-ownership section of the questionnaire on September 30, 2015. POSCO's response provided a list of POSCO's cross-owned affiliates, including a brief description of their business, and also its consolidated financial statement that listed the amount of sales and purchases between POSCO and its cross-owned affiliates as well as the total sales value for its cross-owned affiliates. Relying upon its understanding of Commerce's regulations and practice regarding cross-owned input suppliers, POSCO did not believe that any of its cross-owned affiliates provided inputs that were "primarily dedicated" to the production of the downstream product because the inputs provided by these affiliates did not account for a significant percentage of the affiliates' total sales, nor did the inputs account for a significant part of POSCO's cost of production. POSCO thus reported in its response that: "There were no cross-owned companies located in Korea that provided inputs to POSCO's production of subject merchandise." POSCO did not submit questionnaire responses for any of its cross-owned affiliates.

12. Commerce issued one supplemental questionnaire related to POSCO's affiliation and cross-ownership response, but asked no specific questions about any of POSCO's cross-owned affiliates. Instead, Commerce simply asked POSCO to confirm that it had provided responses for all cross-owned companies that fall within 19 C.F.R. § 351.525(b)(6). In response, POSCO confirmed that it believed it had provided responses for all cross-owned companies that fall within 19 C.F.R. § 351.525(b)(6). No further questions were asked by Commerce about POSCO's cross-owned affiliates.

13. Commerce also investigated certain alleged benefits provided to companies located in Industrial Complexes and Free Economic Zones ("FEZs"). In its initial questionnaire response, POSCO reported that it "has no facilities located in a free economic zone ('FEZ') and thus was not eligible for and did not receive any tax reductions, exemptions, grants or financial support under any of the three programs listed in the Department's question." The GOK reported in its initial questionnaire response that "{d}uring the investigation period, none of the respondents received tax reductions or exemptions, lease-fee reductions or exemptions, or grants or financial support due to their location in an FEZ."

14. POSCO also reported in its initial questionnaire response that Daewoo International Corporation ("DWI"), an affiliated trader for which POSCO provided a full questionnaire response,[1] had received loans from the Korea Resource Development Corporation ("KORES") for certain overseas investments. In a subsequent supplemental response, POSCO provided a full response regarding DWI's receipt of these loans at the request of Commerce and reported loans it had received from KORES.

15. On December 15, 2015, Commerce issued the preliminary negative determination in which it calculated a 0.18 percent subsidy for POSCO, which was *de minimis*.

16. Commerce conducted verification of POSCO and DWI between March 14 and 18, 2016. Although nothing in the verification outline indicated that cross-ownership and affiliation were going to be a primary focus of the verification, Commerce officials spent the better part of four days investigating the business operations of POSCO's cross-owned affiliates. This

---

[1] POSCO submitted a complete questionnaire response for DWI because it was cross-owed with POSCO and acted as a trading company that exported POSCO subject merchandise to the United States during the investigation period. Trading companies are also another category of affiliates that are required to submit complete questionnaire responses. *See* 19 C.F.R. § 351.525(c). POSCO does not contest that DWI was properly required to submit a complete questionnaire response.

6

included arranging in-person meetings with one affiliate and having telephone interviews with six other affiliates and conducting a mini-investigation into these affiliates' operations and any possible involvement in the sale, production, or research and development activities related to the subject merchandise. POSCO fully cooperated with this unexpected verification of these cross-owned affiliates.

17. Commerce also requested and was provided a list of all raw material inputs that could be used by POSCO to produce subject merchandise and a list of POSCO's suppliers for many of these inputs along with the purchased amounts of these inputs during the period of investigation. POSCO is a fully integrated steel producer and thus produces iron, which is then used to produce all different kinds of steel products, with the subject cold-rolled steel being one of them. The raw material list thus showed that several of POSCO's cross-owned affiliates had provided small amounts of certain raw material inputs that could be used to produce iron that is then used to produce various products, including the subject merchandise.

18. As noted in the verification report, Commerce officials asked POSCO why it had not submitted responses for these cross-owned affiliates. To substantiate the reason that POSCO had not identified these cross-owned affiliates as input suppliers that needed to submit complete responses, POSCO presented to Commerce at its request during verification the original raw material input list that included information showing the total sales of the input suppliers and the percentage of the input suppliers' sales to POSCO as a percentage of the input suppliers' total sales. This information substantiated POSCO's reasonable belief that these companies were not input suppliers that were relevant to the investigation based on POSCO's understanding of the "primarily dedicated" regulation and Commerce's practice.

7

19. The Commerce verifiers refused to accept this information and in fact crossed-out the relevant details that substantiated POSCO's explanation for not reporting for these input suppliers, requesting a revised copy of the list without this information included. POSCO later attempted to file the original version of the input supplier list that had been presented at verification, but Commerce rejected it and removed it from the record. Thus, the verification exhibit that was taken by Commerce and that is on the record is not the one that was originally presented by POSCO during verification.

20. Commerce also conducted a separate verification of DWI. At the start of that verification, DWI presented minor corrections to Commerce and reported that it had received certain additional KORES loans that were not reported in its questionnaire response. Although DWI had reported certain of these KORES loans in its questionnaire response, DWI had mistakenly believed that they only needed to report "success-contingent" loans and not all general loans from KORES. The minor correction attempted to provide the additional general loans that had inadvertently not been reported in DWI's response. Commerce requested that DWI submit these minor corrections, which it timely filed on March 22, 2016.

21. On March 29, 2016, Nucor submitted a letter arguing that DWI's minor corrections were not, in fact, "minor" and therefore Commerce should refuse to accept these already filed minor corrections and should instead apply adverse facts available ("AFA") in calculating a loan benefit to DWI. On April 1, 2016, POSCO responded, arguing among other points that, as the loans reported in its minor corrections were KORES loans and it had already provided a full response for KORES loans, the reporting of these additional loans *was* a minor correction and is actually the precise type of information that minor corrections submissions are

8

supposed to cover. Commerce ultimately determined that DWI's disclosure of these additional KORES loans did not constitute a minor correction and rejected DWI's submission.

22. Although the POSCO verification had concluded the day prior, Commerce officials continued to ask questions about POSCO's possible location in an FEZ as part of their verification of DWI. Specifically, Commerce officials noted that a facility described as the POSCO Global R&D Center was listed on the Korean website for the Songdo FEZ and asked the lone POSCO representative who was at the DWI verification about this facility. Given the late time at which this issue was raised, and the fact that the POSCO official present had no knowledge of this particular facility, it was not possible to provide additional details about this facility and whether it was located in an FEZ.

23. Commerce subsequently issued its verification report for POSCO in which it noted as one of the "issues" that POSCO did purchase raw materials from certain cross-owned affiliates that were used in the production of subject merchandise. Commerce also identified two other issues in its verification report: first, that POSCO had not reported that it had a research and development ("R&D") facility in an FEZ even though Commerce was investigating alleged subsidies to companies located in FEZs; and second, that DWI had failed to report certain loans that were under investigation – specifically, those loans which DWI attempted to submit as a minor correction. Other than these three issues, Commerce confirmed that it was able to fully verify POSCO's questionnaire responses.

24. The parties filed case briefs on May 16, 2016. In its case brief, the petitioner Nucor argued, among other matters, that Commerce should apply AFA amounting to 678.78 percent because POSCO purportedly withheld information regarding certain cross-owned input suppliers, failed to disclose the location of an R&D facility in an FEZ, failed to report all

9

KORES loans for DWI, and for the GOK's alleged failure to permit verification of certain loan programs.

25. POSCO argued that the issues identified in the verification report should not impact the preliminary determination because, *inter alia*, the cross-owned input suppliers identified in Commerce's verification report were not required to submit complete questionnaire responses because the inputs they provided to POSCO were not primarily dedicated to the production of the downstream product. As support, POSCO provided calculations using record information showing that the value of the inputs sold to POSCO was not significant as a percentage of these affiliates' total sales to all customers and that the inputs purchased by POSCO from these input suppliers was insignificant as a percentage of POSCO's total cost of sales. POSCO also argued that there was no basis to apply any AFA for POSCO not reporting for these affiliates because its decision not to submit complete responses for these cross-owned input suppliers was objectively reasonable and was based on its interpretation of "primarily dedicated" in Commerce's regulations and in its recent cases.

26. On May 25, 2016, the parties submitted rebuttal briefs. In its rebuttal brief, POSCO argued that record evidence showed that the sales of inputs purchased by POSCO from POSCO Chemtech Company, Ltd. ("Chemtech"), POSCO Processing and Service ("POSCO P&S"), POSCO M-Tech Co., Ltd. ("POSCO M-Tech"), and POS-HiMetal Co. Ltd. ("POS-HiMetal") all constituted an insignificant percentage of the input suppliers' total sales. Therefore, these input suppliers did not provide inputs that were "primarily dedicated" to the production of the downstream product in accordance with Commerce's regulations, stated methodology, and past practice, and thus subsidies received by these input suppliers should not be attributed to POSCO. POSCO argued that it therefore did not fail to provide complete

responses for input suppliers under 19 C.F.R. § 351.525(b)(6)(iv) and so Commerce did not have a basis to apply AFA for a failure to respond for these input suppliers. POSCO also opposed the use of AFA for its mistake in not reporting the R&D facility's location in an FEZ, the mistake in not reporting all of DWI's KORES loans, and the GOK's alleged failure to permit verification of certain loan programs.

27. Nucor, in its rebuttal brief, reiterated its arguments for the application of AFA for POSCO not submitting responses for its cross-owned input suppliers, for not reporting the location of one of its R&D facilities in an FEZ, and for DWI's failure to report all of its KORES loans.

28. Commerce issued its Final Determination on July 20, 2016. In its accompanying Issues and Decision Memorandum, Commerce stated that it determined that POSCO had failed to provide responses for certain cross-owned input suppliers. Based on this determination, Commerce concluded as AFA that inputs produced by POSCO Chemtech, POSCO P&S, POSCO M-Tech, and POS-HiMetal were primarily dedicated to the production of the downstream product, within the meaning of 19 C.F.R. 351.525(b)(6)(iv). *See* Final Determination Issues and Decision Memorandum ("*Final Determination IDM*") at Comment 5. Commerce additionally determined as AFA that POSCO and its cross-owned input suppliers received subsidies, benefited from these subsidies, and that these subsidies were specific for all programs that were initiated upon and investigated by Commerce. Finally, Commerce noted that it also applied AFA to POSCO for the discovery at verification of facilities located in an FEZ and for DWI's failure to report the KORES loans it attempted to disclose in its minor corrections. *See Final Determination IDM* at 11.

29. To establish AFA rates for the alleged programs, Commerce stated in its Issues and Decision Memorandum that it used the following methodology, in accordance with its standard practice:

> It is the Department's practice in CVD proceedings to compute an AFA rate for non-cooperating companies using the highest calculated program-specific rates determined for a cooperating respondent in the same investigation, or, if not available, rates calculated in prior CVD cases involving the same country. Specifically, the Department applies the highest calculated rate for the identical subsidy program in the investigation if a responding company used the identical program, and the rate is not zero. If there is no identical program match within the investigation, or if the rate is zero, the Department uses the highest non-*de minimis* rate calculated for the identical program in a CVD proceeding involving the same country. If no such rate is available, the Department will use the highest non-*de minimis* rate for a similar program (based on treatment of the benefit) in another CVD proceeding involving the same country. Absent an above-*de minimis* subsidy rate calculated for a similar program, the Department applies the highest calculated subsidy rate for any program otherwise identified in a CVD case involving the same country that could conceivably be used by the non-cooperating companies. *Id.* at 12.

30. In applying this methodology, where available Commerce used the above zero rates calculated for identical programs for the other mandatory respondent, Hyundai Steel, in the investigation and then applied a 1.05 percent rate established in *Washers from Korea* for all tax programs and a 1.65 percent rate established in *Refrigerators from Korea* for all other programs. *Id.* at 16-17. Commerce did not specifically state how these rates from *Washers from Korea* and *Refrigerators from Korea* fit into its stated methodology, but it appears that these were considered to be the highest calculated subsidy rates for any program in Korea that could conceivably be used by POSCO. Commerce did not explain why it was appropriate based on the facts and circumstances of this investigation to apply the highest calculated rates found in previous Korean cases to POSCO. The total AFA rate that Commerce applied to POSCO in the *Final Determination* was 58.36 percent.

31. On July 27, 2016, POSCO submitted a ministerial error letter alleging that Commerce's application of its AFA methodology was not in accordance with its past practice or stated methodology. Specifically, POSCO alleged that Commerce applied AFA to certain programs it explicitly identified as not countervailable; that it did not follow its stated methodology because there were above-*de mimimis* rates calculated for the same programs in other proceedings that Commerce did not rely on; and that Commerce relied upon rates that could not conceivably be used by the non-cooperating respondents.

32. On August 24, 2016, Commerce issued a ministerial error memorandum and revised its application of AFA based on POSCO's ministerial error allegation. Therein, it noted that it agreed with POSCO that the 1.65 percent rate from *Refrigerators from Korea* was a company-specific rate that would be unavailable to POSCO. Commerce concluded that, therefore, it should not have relied on this rate in calculating an AFA rate for POSCO, in accordance with its practice. Instead it used a 1.64 percent rate calculated in *Refrigerators from Korea*, a rate that was not calculated for a specific respondent, but was itself derived from an AFA finding. Commerce also found that it had made a ministerial error in inadvertently not including a benefit for one of the programs. The net result was that Commerce actually further increased POSCO's AFA margin by another 1.64 percent for this program. POSCO's subsidy rate thus increased from 58.36 percent to 59.72 percent.

33. This appeal followed.

## STATEMENT OF CLAIMS

### Count One

34. Paragraphs 1 to 33 are incorporated by reference.

35. Commerce's decision to apply AFA to POSCO for not submitting responses for certain cross-owned affiliates is not supported by substantial evidence and is otherwise not in accordance with law because POSCO's decision not to report for these companies was based on an objectively reasonable interpretation of Commerce's regulations and practice regarding the attribution of subsidies received by cross-owned input suppliers.

### Count Two

36. Paragraphs 1 to 35 are incorporated by reference.

37. Commerce's use of the highest calculated rates in Korea for programs that could have conceivably been used by POSCO as the AFA rates applied to POSCO is not supported by substantial evidence because Commerce did not evaluate the facts and circumstances that resulted in the use of AFA and explain why the situation warranted the use of the highest rates as required by 19 U.S.C. § 1677e(d)(2).

### Count Three

38. Paragraphs 1 to 37 are incorporated by reference.

39. Commerce's established AFA CVD methodology, which automatically defaults to the highest rates calculated, is not in accordance with law because it is inconsistent with 19 U.S.C. § 1677e(d)(2), which requires Commerce to evaluate the facts and circumstances that led it to apply an adverse inference.

### Count Four

40. Paragraphs 1 to 39 are incorporated by reference.

41. Commerce's determination that it did not have to corroborate the AFA rates applied to POSCO because the AFA rates it used were calculated in previous Korean CVD investigations or reviews is not in accordance with law and Commerce's use of these uncorroborated AFA rates to calculate POSCO's margin is unsupported by substantial evidence.

### Count Five

42. Paragraphs 1 to 41 are incorporated by reference.

43. Commerce's decision to apply AFA for POSCO's error in not reporting that one of its R&D facilities was in an FEZ is not supported by substantial evidence and is not in accordance with law because the GOK reported that none of the mandatory respondents, including POSCO, received any FEZ benefits.

### Count Six

44. Paragraphs 1 to 43 are incorporated by reference.

45. Commerce's rejection of minor corrections submitted by POSCO's affiliated trading company, DWI, was not supported by substantial evidence and is not in accordance with law because the corrections were to information regarding a program that had already been reported by DWI and would have resulted in the calculation of the most accurate margin.

## **DEMAND FOR JUDGMENT AND PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court:

a. Hold that Commerce's *Final Determination* and *Amended Final Determination* and *Order* are not supported by substantial evidence and are otherwise not in accordance with law;

b. Remand this case to Commerce for a re-determination consistent with the judgment and findings of this Court; and

c. Grant such other relief as the Court shall deem just and proper.

                                              Respectfully submitted,

                                              /s/ Donald B. Cameron
                                              Donald B. Cameron
                                              Julie C. Mendoza
                                              R. Will Planert
                                              Brady W. Mills
                                              Eugene Degnan
                                              Mary S. Hodgins
                                              Sarah S. Sprinkle

                                              MORRIS MANNING & MARTIN LLP
                                              1401 Eye Street, NW, Suite 600
                                              Washington, D.C. 20005
                                              (202) 216-4811

Dated: November 14, 2016                               *Counsel to POSCO*