Slip Op. 18-18

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| POSCO et al., | |
| Plaintiffs, | |
| and | |
| AK STEEL CORPORATION, et al., | |
| Plaintiff-Intervenors, | Before: Mark A. Barnett, Judge |
| v. | Consol. Court No. 16-00225 |
| UNITED STATES, | **PUBLIC VERSION** |
| Defendant, | |
| and | |
| STEEL DYNAMICS, INC., et al., | |
| Defendant-Intervenors. | |

## <u>OPINION AND ORDER</u>

[Granting in part and denying in part Plaintiff POSCO's motion for judgment upon the agency record; denying Plaintiff Nucor Corporation's motion for judgment upon the agency record.]

Dated: March 8, 2018

<u>Donald B. Cameron</u> and <u>Brady W. Mills</u>, Morris Manning & Martin LLP, of Washington, DC, argued for Plaintiff POSCO and Defendant-Intervenors the Government of Korea, POSCO, and Hyundai Steel Company.  With them on the brief were <u>Julie C. Mendoza</u>, <u>R. Will Planert</u>, <u>Mary S. Hodgins</u>, <u>Eugene Degnan</u>, <u>Sarah S. Sprinkle</u>, and <u>Henry N. Smith</u>.

<u>Timothy C. Brightbill</u>, Wiley Rein LLP, of Washington, DC, argued for Plaintiff and Defendant-Intervenor Nucor Corporation.  With him on the brief were <u>Alan H. Price</u>, <u>Tessa V. Capeloto</u>, and <u>Adam M. Teslik</u>.

Kathleen W. Cannon, R. Alan Luberda, and Melissa M. Brewer, Kelley Drye & Warren LLP, of Washington, DC, for Plaintiff-Intervenor and Defendant-Intervenor ArcelorMittal USA LLC.

Stephen A. Jones and Daniel L. Schneiderman, King & Spalding LLP, of Washington, DC, for Plaintiff-Intervenor and Defendant-Intervenor AK Steel Corporation.

Jeffrey D. Gerrish, Nathaniel B. Bolin, and Luke A. Meisner, Skadden Arps Slate Meagher & Flom LLP, of Washington, DC, for Plaintiff-Intervenor and Defendant-Intervenor United States Steel Corporation.

Renée A. Burbank, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for Defendant United States. With her on the brief were Chad A. Readler, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Patricia M. McCarthy, Assistant Director.  Of counsel on the brief was Amanda T. Lee, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

Barnett, Judge:  In this consolidated action, Plaintiff POSCO ("POSCO"), Plaintiff

Nucor Corporation ("Nucor"), and Plaintiff-Intervenors ArcelorMittal USA LLC, AK Steel

Corporation, and United States Steel Corporation challenge the final determination of

the U.S. Department of Commerce ("Commerce" or the "agency") in its countervailing

duty ("CVD") investigation of cold-rolled steel products ("cold-rolled steel") from the

Republic of Korea ("Korea").  *See Countervailing Duty Investigation of Certain Cold-*

*Rolled Steel Flat Products from the Republic of Korea*, 81 Fed. Reg. 49,943 (Dep't

Commerce July 29, 2016) (final aff. determination; 2014) ("*Final Determination*"), ECF

No. 41-4, as amended by *Certain Cold-Rolled Steel Flat Products from Brazil, India, and*

*the Republic of Korea*, 81 Fed. Reg. 64,436 (Dep't Commerce Sept. 20, 2016) (am. final

aff. countervailing duty determination and countervailing duty order; 2014) ("*Am. Final*

*Determination*"), ECF No. 41-3, and accompanying Issues and Decision Mem., C-580-882 (July 20, 2016) ("I&D Mem."), ECF No. 41-5.[1]

POSCO (a Korean cold-rolled steel producer) challenges Commerce's use of the facts available with an adverse inference (referred to as "adverse facts available" or "AFA") for several reporting errors and its selection and corroboration of adverse facts available rates.  *See* Confidential Mot. of Pl. POSCO for J. on the Agency R., ECF No. 53, and Confidential Pl. POSCO's Br. in Supp. of its Mot. for J. on the Agency R. ("POSCO Mot.") at 2-3, ECF No. 59-1.  Nucor and Plaintiff-Intervenors (domestic cold-rolled steel producers) (collectively, "Nucor") challenge Commerce's finding that the Government of Korea ("GOK") did not provide electricity for less than adequate remuneration and its decision not to use adverse facts available with respect to the electricity program based on the GOK's questionnaire responses.  *See* Confidential Pl. Nucor Corp. and Pl.-Ints. ArcelorMittal USA LLC, AK Steel Corp, and United States Steel Corp.'s Rule 56.2 Mot. for J. on the Agency R. ("Nucor Mot.") at 2-3, ECF No. 56. Defendant United States ("Defendant" or the "Government") supports Commerce's

---

[1] The administrative record is divided into a Public Administrative Record ("PR"), ECF No. 41-1, and a Confidential Administrative Record ("CR"), ECF No. 41-2.  Parties submitted joint appendices containing all record documents cited in their briefs.  *See* Public Joint App. ("PJA"), ECF No. 80; Confidential Joint App. ("CJA"), ECF Nos. 77-79; Supplemental Public Joint App., ECF No. 88-1; Supplemental Confidential Joint App., ECF No. 87-1.  The court references the confidential versions of the relevant record documents, if applicable, unless otherwise specified.

determination.  *See generally* Confidential Def.'s Resp. to Pls.' Mots. For J. Upon the

Agency R. ("Gov. Resp"), ECF No. 65.[2]

For the following reasons, the court remands Commerce's selection of the

highest calculated rate as POSCO's AFA rate and Commerce's selection of an AFA rate

that is itself based on adverse facts available.  Accordingly, the court grants, in part,

POSCO's motion with respect to those issues, and denies the motion in all other

respects.  The court sustains Commerce's determinations regarding the GOK's

provision of electricity for not less than adequate remuneration and the adequacy of its

questionnaire responses.  Accordingly, the court denies Nucor's motion in full.

## BACKGROUND

### I.   Legal Framework

#### A.  Basic CVD Principles

Commerce "impose[s] countervailing duties on merchandise that is produced

with the benefit of government subsidies" when the various statutory criteria are met.

*Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365, 1369 (Fed. Cir. 2014);

---

[2] Court Nos. 16-00225 and 16-00226 were consolidated under lead Court No. 16-00225.  Order (Jan. 18, 2017), ECF No. 44.  Defendant-Intervenors in 16-00225 (AK Steel Corporation, ArcelorMittal USA LLC, Nucor, and United States Steel Corporation (collectively, "Petitioner Defendant-Intervenors")) filed a response to POSCO's motion for judgment on the agency record.  *See generally* Confidential Resp. Br. of Def.-Ints. AK Steel Corp., Arcelor Mittal USA LLC, Nucor Corp., and United States Steel Corp. ("Pet'r Def.-Int. Resp."), ECF No. 70.  Defendant-Intervenors in Court No. 16-00226 (the GOK, POSCO, and Hyundai Steel Company (collectively, "Respondent Defendant-Intervenors")) filed a response to Nucor's motion for judgment on the agency record.  *See generally* Confidential Def.-Ints.' Br. in Opp'n to Pl. and Pl.-Ints.' Mot. for J. on the Agency R. ("Resp't Def.-Int. Resp."), ECF No. 69.

*see also* 19 U.S.C. § 1671(a) (2012).[3]   Among other things, countervailable subsidies

arise "when (1) a foreign government provides a financial contribution (2) to a specific

industry and (3) a recipient within the industry receives a benefit as a result of that

contribution."  *Fine Furniture (Shanghai)*, 748 F.3d at 1369 (citing 19 U.S.C.

§ 1677(5)(B)).  Investigating these factors requires Commerce to obtain information

from the foreign government alleged to have provided the subsidy and the

producer/respondent that purportedly benefitted from the subsidy.  *See Essar Steel Ltd*.

*v. United States*, 34 CIT 1057, 1070, 721 F. Supp. 2d 1285, 1296, (2010), *rev'd on other*

*grounds*, 678 F.3d 1268 (Fed. Cir. 2012).  The information Commerce receives is

subject to verification.  *See* 19 U.S.C. § 1677m(i)(1).

### B.  Sales for Less than Adequate Remuneration

A countervailable benefit includes the provision of goods or services "for less

than adequate remuneration."  19 U.S.C. § 1677(5)(E)(iv).  The statute directs

Commerce to determine the adequacy of remuneration "in relation to prevailing market

conditions for the good or service being provided or the goods being purchased in the

[subject] country . . . .  Prevailing market conditions include price, quality, availability,

marketability, transportation, and other conditions of purchase or sale."  *Id.*

---

[3] All further citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code, and all references to the United States Code are to the 2012 edition, unless otherwise stated.  *See infra*, note 8 (explaining that references to 19 U.S.C. § 1677e are to the 2015 version of the statute enacted pursuant to The Trade Preferences Extension Act ("TPEA"), Pub. L. No. 114–27, § 502, 129 Stat. 362, 383–84 (2015)).

Commerce's regulations prescribe a three-tiered approach for determining the adequacy of remuneration.  *See* 19 C.F.R. § 351.511.[4]  Commerce first seeks to compare the government price to a market-based price for the good or service under investigation in the country in question (a "Tier 1" analysis).  *Id.* § 351.511(a)(2)(i).  When an in-country market-based price is unavailable, Commerce will compare the government price to a world market price, when the world market price is available to purchasers in the country in question (a "Tier 2" analysis).  *Id.* § 351.511(a)(2)(ii).  When, as here, both an in-country market-based price and a world market price are unavailable, Commerce considers "whether the government price is consistent with market principles" (a "Tier 3" analysis).  *Id.* § 351.511(a)(2)(iii).

In the Preamble to the final rule implementing Commerce's CVD regulations, Commerce explained that a Tier 3 analysis requires an examination of "such factors as the government's price-setting philosophy,[5] costs (including rates of return sufficient to ensure future operations), or possible price discrimination."  *Countervailing Duties*, 63

---

[4] On December 8, 1994, Congress enacted the Uruguay Round Agreements Act.  *See* Uruguay Round Agreements Act ("URAA"), Pub. L. No. 103-465, § 101, 108 Stat. 4814 (codified as 19 U.S.C. § 3511 (1994)).  Before passage of the URAA, § 1677 defined "subsidy," *inter alia*, as "[t]he provision of goods or services at preferential rates."  *See* 19 U.S.C. § 1677(5)(A)(ii)(II) (1988).  Pursuant to "the former preferentiality standard, 'preferential' meant 'more favorable treatment to some within the relevant jurisdiction than to others within that jurisdiction,' but not that preferential treatment was necessarily 'inconsistent with commercial considerations.'"  *Maverick Tube Corp. v. United States*, 41 CIT ___, ___, 273 F. Supp. 3d 1293, 1297 (2017) (citations omitted).  For further discussion on Commerce's development of the regulation implementing the "adequate remuneration" standard, 19 C.F.R. § 351.511, see *id.* at 1297-99.

[5] Commerce also refers to a "price-setting philosophy" as a "standard pricing mechanism."  *See* I&D Mem. at 46.

Fed. Reg. 65,348, 65,378 (Dep't Commerce Nov. 25, 1998) ("*CVD Preamble*").  Those

factors are not "in any hierarchy," and Commerce "may rely on one or more of these

factors in any particular case."  *Id.*  Commerce recognized that a Tier 3 analysis may be

particularly "necessary for such goods or services as electricity, land leases, or water."

*Id.* (citing, *inter alia*, *Pure Magnesium and Alloy Magnesium from Canada*, 57 Fed. Reg.

30,946, 30,954 (Dep't Commerce July 13, 1992) ("*Magnesium from Canada*")).

        In *Magnesium from Canada*, Commerce explained that examining the

preferential provision of electricity first requires a comparison of "the price charged with

the applicable rate on the power company's non-specific rate schedule."  57 Fed. Reg.

at 30,949.  However, "[i]f the amount of electricity purchased by a company is so great

that the rate schedule is not applicable, we will examine whether the price charged is

consistent with the power company's standard pricing mechanism applicable to such

companies."  *Id.* at 30,949-50.[6]  When "the rate charged is consistent with the standard

pricing mechanism and the company under investigation is, in all other respects,

essentially treated no differently than other industries which purchase comparable

amounts of electricity, [Commerce] would probably not find a countervailable subsidy."

*Id.* at 30,950.

---

[6] In *Magnesium from Canada*, the government-owned power company signed contracts
with 14 large industrial consumers of its electricity.  57 Fed. Reg. at 30,949.  Some
portion of the electricity rate for these customers depended upon the price of their
products or their profitability, and, thus, the electricity price varied each year.  *Id.*  The
contracts were negotiated such that the power company expected to earn the same
revenue as it would have under its general rates and programs. *Id.*  Because the
general rates were inapplicable to these 14 companies, Commerce compared the price
charged to the power company's standard pricing mechanism.  *Id.*

### C. Facts Available and Adverse Facts Available

When an interested party "withholds information" requested by Commerce, "significantly impedes a proceeding," "fails to provide [] information by the deadlines for submission of the information," or provides information that cannot be verified pursuant to 19 U.S.C. § 1677m(i), Commerce shall use the "facts otherwise available" (or "FA") in making its determination.[7]  19 U.S.C. § 1677e(a)(2)(2015).[8]  Additionally, if Commerce determines that the party "has failed to cooperate by not acting to the best of its ability to comply with a request for information," it "may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available."  *Id*. § 1677e(b)(1)(A).[9]

"Compliance with the 'best of its ability' standard is determined by assessing whether a respondent has put forth its maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation."  *Nippon Steel Corp. v. United*

---

[7] Commerce's authority to use the facts otherwise available is subject to 19 U.S.C. § 1677m(d).  *See* 19 U.S.C. § 1677e.  Section 1677m(d) provides the procedures Commerce must follow when a party files a deficient submission.  *See id.* § 1677m(d).

[8] The 2015 TPEA made several amendments to the antidumping and countervailing duty laws. Specifically, subsections (b) and (c) of § 1677e were amended, and subsection (d) was added.  *See* TPEA § 502; *Özdemir Boru San. ve Tic. Ltd. Sti. v. United States*, Slip Op. 17-142, 2017 WL 4651903, at *1 (CIT Oct. 16, 2017) (discussing the TPEA amendments).  The TPEA amendments affect all CVD determinations made on or after August 6, 2015.  *See* Dates of Application of Amendments to the Antidumping and Countervailing Duty Laws Made by the Trade Preferences Extension Act of 2015, 80 Fed. Reg. 46,793 (Dep't Commerce Aug 6, 2015).  All references to 19 U.S.C. § 1677e are to the amended version of the statute.

[9] In making its determination, Commerce "is not required to determine, or make any adjustments to, a countervailable subsidy rate . . . based on any assumptions about information the [respondent] would have provided if [it] had complied with the request for information."  19 U.S.C. § 1677e(b)(1)(B).

*States,* 337 F.3d 1373, 1382 (Fed. Cir. 2003);[10] *see also Essar Steel Ltd. v. United States*) ("*Essar Steel I*"), 678 F.3d 1268, 1275-76 (Fed. Cir. 2012) (reaffirming *Nippon Steel*'s interpretation of what is required for respondents to comply with the "best of its ability" standard).  Before using adverse facts available, Commerce "must make an objective showing that a reasonable and responsible importer would have known that the requested information was required to be kept and maintained under the applicable statutes, rules, and regulations."  *Nippon Steel*, 337 F.3d at 1382.  Next, Commerce

> must [] make a subjective showing that the respondent['s] . . . failure to fully respond is the result of the respondent's lack of cooperation in either: (a) failing to keep and maintain all required records, or (b) failing to put forth its maximum efforts to investigate and obtain the requested information from its records.

*Id.* at 1382-83.

"An adverse inference may not be drawn merely from a failure to respond."  *Id.* at 1383.  Rather, Commerce may apply an adverse inference "under circumstances in which it is reasonable for Commerce to expect that more forthcoming responses should have been made."  *Id*. (affirming Commerce's use of an adverse inference when respondent first told Commerce the requested information was unnecessary, then told Commerce the information did not exist, and only later produced the information after Commerce assigned an adverse dumping margin, at which time the respondent told Commerce it had never asked its factories for the information during the investigation).

---

[10] *Nippon Steel* predates the TPEA.  However, the relevant statutory language discussed in that case remains unchanged.  *Compare* 19 U.S.C. § 1677e(b)(2012), *with* 19 U.S.C. § 1677e(b)(1)(2015).

When applying an adverse inference, Commerce may rely on information derived from the petition, a final determination in the investigation, a previous administrative review, or any other information placed on the record.  *See* 19 U.S.C. § 1677e(b)(2); 19 C.F.R. § 351.308(c)(2015).  When Commerce relies on secondary information, that is, information that was not obtained in the course of the instant investigation or review, Commerce "shall, to the extent practicable, corroborate that information from independent sources that are reasonably at [its] disposal."  19 U.S.C. § 1677e(c)(1). The corroboration requirement does not apply to a "countervailing duty applied in a separate segment of the same proceeding."  *Id*. § 1677e(c)(2).  Pursuant to Commerce's regulations, corroboration requires the agency to assess "whether the secondary information to be used has probative value."  19 C.F.R. § 351.308(d).  When corroboration is not "practicable in a given circumstance," Commerce may still "apply[] an adverse inference as appropriate and us[e] the secondary information in question." *Id.*

### D.  Selecting an AFA Rate

Section 1677e(d) governs Commerce's selection of subsidy rates to apply as adverse facts available.  In a CVD proceeding, Commerce may "use a countervailable subsidy rate applied for the same or similar program in a countervailing duty proceeding involving the same country; or [] if there is no same or similar program, use a countervailable subsidy rate for a subsidy program from a proceeding that the administering authority considers reasonable to use."  19 U.S.C. § 1677e(d)(1)(A). Commerce "may apply any of the countervailable subsidy rates . . . specified under []

paragraph [1], including the highest such rate or margin, based on the evaluation by [Commerce] of the situation that resulted in [the agency] using an adverse inference in selecting among the facts otherwise available." *Id.* § 1677e(d)(2).  Commerce need not "estimate what the countervailable subsidy rate . . . would have been if the interested party found to have failed to cooperate . . . had cooperated . . . [or] demonstrate that the countervailable subsidy rate . . . used by [Commerce] reflects an alleged commercial reality of the interested party." *Id.* § 1677e(d)(3).

## II.   Prior Proceedings

In August 2015, Commerce initiated a CVD investigation of cold-rolled steel from several countries.  *See Certain Cold-Rolled Steel Flat Products from Brazil, India, the People's Republic of China, the Republic of Korea, and the Russian Federation*, 80 Fed. Reg. 51,206 (Dep't Commerce Aug. 24, 2015) (initiation of countervailing duty investigations) ("*Initiation Notice*"), CJA Tab 3, PJA Tab 3, PR 58, ECF No. 77. Commerce selected POSCO and Hyundai Steel Co., Ltd. as mandatory respondents for the investigation into cold-rolled steel from Korea.  Respondent Selection Mem. (Sept. 15, 2015) at 6, CJA Tab 4, CR 40, PJA Tab 4, PR 75, ECF No. 77.  The period of investigation ("POI") encompassed January 1 to December 31, 2014.  *Initiation Notice*, 80 Fed. Reg. at 51,206.  The subject merchandise includes "certain cold-rolled (cold-reduced), flat-rolled steel products, whether or not annealed, painted, varnished, or

coated with plastics or other non-metallic substances." *Initiation Notice*, 80 Fed. Reg. at 51,210.[11]

### A.  Questionnaire Responses

#### 1.  POSCO

During the investigation, Commerce issued to POSCO a series of questions regarding its affiliated companies. *See* POSCO CVD Questionnaire (Sept. 16, 2015) at 2-3, CJA Tab 6, PJA Tab 6, PR 77, ECF No. 77.  POSCO submitted a joint response on behalf of itself and its affiliated trading company DWI. *See generally* POSCO Affiliated Companies Resp. (Sept. 30, 2015) ("POSCO AQR"), CJA Tab 7, CR 41, PJA Tab 7, PR 84, ECF No. 77.  In particular, Commerce asked POSCO to "[s]pecify whether an affiliated company supplies inputs into your company's production process." *Id.* at 4. POSCO responded that "[t]here were no affiliated companies located in Korea that provided inputs to POSCO's production of subject merchandise." *Id*.  In response to Commerce's instruction that POSCO must provide a complete questionnaire response for affiliates that supply inputs for production of the downstream product, POSCO affirmed that "[t]here were no affiliated companies located in Korea that provided inputs to POSCO's production of subject merchandise." *Id.* at 4-5.  In a supplemental questionnaire, Commerce requested POSCO to "confirm that you have provided responses for all cross-owned companies[12] that fall within 19 C.F.R. [§] 351.525(b)(6)."

---

[11] For a full description of the scope of the investigation, see *Initiation Notice*, 80 Fed. Reg. at 51,210.

[12] Commerce used the terms "affiliated" and "cross-owned" interchangeably.

POSCO Second Suppl. Questionnaire Resp. (Nov. 12, 2015) ("POSCO 2nd Suppl.

QR") at 1, CJA Tab 12, CR 353, PJA Tab 12, PR 289, ECF No. 78.  POSCO answered

"that it believes it has provided responses for all cross-owned companies that fall within

19 C.F.R. § 351.525(b)(6)."  *Id.*

Commerce also asked POSCO about subsidies to companies located in free

economic zones ("FEZ").  *See* POSCO Initial Questionnaire Resp. (Oct. 23, 2015)

("POSCO IQR") at 52, CJA Tab 8, CR 58-102, PJA Tab 8, PR 120-138, ECF No. 77.

POSCO reported that it "has no facilities located in a [FEZ] and thus was not eligible for

and did not receive any tax reductions, exemptions, grants or financial support under

any of the [] programs listed in [Commerce's] question."  *Id.* at 52.

Commerce inquired about loans to POSCO and DWI from the Korean Resources

Corporation ("KORES") and the Korea National Oil Corporation ("KNOC").  *Id.* at 33.

DWI initially reported that it received KNOC and KORES loans during the POI.  *Id.* at

34.[13]  POSCO subsequently provided more information about those loans.  POSCO 2nd

Suppl. QR, Ex. F-11 at 1-2.[14]

### 2.  The Government of Korea

Relevant here, Commerce requested that the GOK provide information regarding

the Korean electricity industry and market generally, and the Korea Electric Power

---

[13] "There are two types of loans in the [KORES/KNOC] program: 'general loans' and 'success-contingent' loans."  POSCO 2nd Suppl. QR, Ex. F-11 at 1.  DWI's reported KORES and KNOC loans were [[                    ]] loans.  *See id.*, Ex. F-11 at 1-2.
[14] Specifically, POSCO reported that DWI had [[  ]] KNOC and [[  ]] KORES [[       ]] loans.  *See* POSCO 2nd Suppl. QR, Ex. F-12.

Corporation ("KEPCO") specifically.  *See* GOK CVD Questionnaire (Sept. 16, 2015),

Sect. II at 2-7, CJA Tab 5, PJA Tab 5, PR 76, ECF No. 77.  KEPCO is a "state-owned

entity," Decision Mem. for the Prelim. Neg. Determination (Dec. 15, 2015) ("Prelim.

Mem.") at 30, CJA Tab 17, PJA Tab 17, PR 338, ECF No. 78 (citation omitted),[15] and is

"the exclusive supplier of electricity in Korea," The Republic of Korea's Resp. to CVD

Questionnaire (Oct. 30, 2015) ("GOK QR") at 4, CJA Tab 9, CR 108-217, PJA Tab 9,

PR 147-218, ECF Nos. 77-78; *see also* Prelim. Mem. at 30 (noting that "KEPCO is an

integrated electric utility company engaged in the transmission and distribution of

substantially all of the electricity in Korea.") (citation omitted).

The GOK explained that electricity is generated by "[i]ndependent power

generators, community energy systems, and KEPCO's six subsidiaries."  GOK QR at

11.[16]  By law, electricity must be bought and sold through the Korean Power Exchange

(the "KPX"), including by KEPCO.  *Id.*[17]  The GOK also noted that KEPCO's electricity

tariff rates are approved by the Ministry of Trade, Industry and Energy ("MOTIE").  *Id*;[18]

---

[15] By law, the GOK must own "at least 51 percent of KEPCO's capital, which allows the GOK to control the approval of corporate matters relating to KEPCO."  Prelim. Mem. at 30 (citation omitted).

[16] KEPCO itself generally does not produce electricity but distributes electricity to customers.  GOK QR at 11.

[17] KEPCO and its subsidiaries own 100 percent of the KPX's shares.  GOK QR, Ex. E-3 at 31.

[18] MOTIE supervises certain of KEPCO's operations.  *See* GOK QR at 7.  In particular, [t]o change electricity tariff rates, KEPCO files an application for rate changes with the MOTIE. Upon receipt of an application, the MOTIE consults with the MOSF [Ministry of Strategy and Finance] to measure the potential impact of proposed electricity tariff rate changes on the national consumer price index. After consultation with the MOSF, the MOTIE requests the Korean Electricity Regulatory Commission ("KOERC") to

*see also id.* at 13 (explaining that MOTIE sets Korean electricity rates through its approval or disapproval of KEPCO's applications to change the tariff rates, and MOSF "considers the impact of changes in electricity rates on the national economy"). Electricity tariff rates must, by law, "be set to cover the aggregate costs," including "a reasonable rate of return on investment." *Id.* at 17.[19]

Commerce issued to the GOK a supplemental questionnaire asking it to clarify MOSF's review process. The Republic of Korea's Resp. to CVD Suppl. Questionnaire (Nov. 20, 2015) ("GOK Suppl. QR") at 9, CJA Tab 13, CR 369-377, PJA Tab 13, PR 300-304, ECF No. 78. The GOK responded that "MOSF normally does not engage in a detailed review of the proposed change to the tariff rate schedule, as long as the proposed changes are not inconsistent with general price trends in Korea." *Id.* Because the (most recent) November 2013 tariff rate changes "were consistent with general price trends in Korea, the MOSF did not engage in a detailed review of those changes when they were proposed." *Id.*; *see also* GOK QR at 15 (noting that the November 2013 electricity tariff rate increase was in effect throughout the POI).

---

review the application and to provide its views on the proposed rate changes. The MOTIE then makes a final decision after considering the KOERC's input.

*Id.*

[19] In KEPCO's Form 20-F filed with the U.S. Securities and Exchange Commission, KEPCO characterized the process the GOK may undertake to approve a tariff rate increase as "lengthy" and "deliberate." GOK QR, Ex. E-3 at 5. KEPCO explained that tariff rates "may not be adjusted to a level sufficient to ensure a fair rate of return . . . in a timely manner or at all," and that KEPCO "cannot assure that any future tariff increase by the [GOK] will be sufficient to fully offset the adverse impact on our results of operation from the current or potential rises in fuel costs." *Id.*

As to FEZ-related benefits, the GOK stated that "[d]uring the investigation period, none of the respondents received tax reductions or exemptions, lease-fee reductions or exemptions, or grants or financial support due to their location in an FEZ."  GOK QR at 108.

On the basis of the questionnaire responses, Commerce issued a preliminary negative determination, calculating a *de minimis* subsidy rate for POSCO of 0.18 percent.  *Countervailing Duty Investigation of Certain Cold-Rolled Steel Flat Products from the Republic of Korea*, 80 Fed. Reg. 79,567, 79,568 (Dep't Commerce Dec. 22, 2015) (prelim. neg. determination and alignment of final determination with final antidumping duty determination), CJA Tab 30, PJA Tab 30, PR 402, ECF No. 79. Commerce also determined that the GOK's provision of electricity was not for less than adequate remuneration.  Prelim. Mem. at 30.

## B. Verification

### 1. POSCO and DWI

Commerce conducted verification at POSCO from March 13 to March 17, 2017, in Seoul, Korea, and at DWI on March 18, 2016.  Verification of POSCO and its Cross-Owned Affiliates' Questionnaire Resp. (March 7, 2016) ("POSCO Verification Agenda") at 1, CJA Tab 18, CR 394, PJA Tab 18, PR 376, ECF No. 78.  Before verification, Commerce instructed POSCO to make available original records substantiating the information reported in its questionnaire responses, and to "[b]e prepared to demonstrate that none of POSCO's other affiliated companies provided inputs for the production of cold-rolled steel or otherwise would fall under our attribution regulations."

*Id.* at 5-6.  Commerce also cautioned POSCO that "verification is not intended to be an opportunity for the submission of new factual information."  *Id.* at 2.  In the course of verification, Commerce discovered several inaccuracies in POSCO's questionnaire responses:

*Cross-Owned Input Suppliers*

At verification, a POSCO official reiterated that no raw material inputs were purchased from Korean affiliated companies.  Verification Report: POSCO and Daewoo Int'l Corp. (Apr. 29, 2016) ("POSCO Verification Report") at 16, CJA Tab 29, CR 454, PJA Tab 29, PR 397, ECF No. 79.[20]  Commerce requested—and POSCO provided—a list of suppliers of raw material inputs used in the production of cold-rolled steel.  *See* POSCO Verification Report at 16; POSCO's Verification Ex. 3 (March 24, 2016) ("POSCO Verification Ex. 3") at ECF pp. 92-94, CJA Tab 22, CR 402-411, PJA Tab 22, ECF No. 79.[21]  Upon reviewing this information, Commerce learned that four POSCO affiliates supplied inputs used in the production of cold-rolled steel.  I&D Mem. at 9 & n.30 (citing POSCO Verification Ex. 3).  They were POSCO Chemtech Company, Ltd.

---

[20] In the underlying administrative proceeding POSCO disputed this statement on the basis that the relevant official would not have understood the question or had access to the necessary information.  *See* POSCO's Case Br. (May 16, 2016) ("POSCO Case Br.") at 12 n. 2, CJA Tab 33, CR 459, PJA Tab 33, PR 410, ECF No. 79.  However, POSCO has not contested this statement in the instant litigation.

[21] In the Issues and Decision Memorandum and briefs before the court, Commerce and the parties cite to pages 73-75 of POSCO's Verification Exhibit 3 for this information.  Because the embedded page numbers have been partially omitted from the copy provided to the court, for ease of reference, the court cites to the electronic page numbers that appear at the top of each page.

("POSCO Chemtech");[22] POSCO Processing and Service ("POSCO P&S");[23] POSCO

M-Tech Co., Ltd. ("POSCO M-Tech");[24] and POS-HiMetal Co., Ltd. ("POS-HiMetal").[25]

*DWI's Loans*

At DWI's verification, POSCO presented "two new loans" under the KORES

program as "minor corrections."  POSCO Verification Report at 3.  Commerce "did not

explicitly state that [it] would accept the submission as a minor correction at the time of

verification."  *Id.*  Upon subsequent review of the loan chart, Commerce found that

---

[22] POSCO Chemtech produces limestone.  *See* POSCO Verification Report at 10; see also POSCO Verification Ex. 3 at ECF p. 93.  When asked why POSCO had not reported this information, POSCO stated that "trace amounts" of limestone are used.  POSCO Verification Report at 10.  Commerce did not verify the amount of limestone purchased for POSCO's cold-rolled steel production.  *Id.* at 11.
[23] POSCO P&S provides steel scrap.  *Id*. at 12; POSCO Verification Ex. 3 at ECF p. 93.
[24] POSCO M-Tech supplies ferro-molybdenum to POSCO.  POSCO Verification Report at 13; POSCO Verification Ex. 3 at ECF p. 94.  When asked why POSCO had not reported POSCO M-Tech's supply of ferro-molybdenum, POSCO officials stated that it "was minimally used in subject merchandise production."  POSCO Verification Report at 13.  Commerce did not verify the amount of ferro-molybdenum used to produce POSCO's cold-rolled steel.  *Id.*
[25] POS-HiMetal supplies high purity ferro-manganese to POSCO.  POSCO Verification Report at 14; POSCO Verification Ex. 3 at ECF p. 94.  POSCO had not reported this information in its questionnaire response because the input is "minimally used" in cold-rolled steel.  POSCO Verification Report at 14.

POSCO had reported POSCO Chemtech, POSCO P&S, and POS-HiMetal as cross-owned companies on the basis of its 60 percent share of ownership.  I&D Mem. at 65; POSCO AQR, Ex. 1 at 1.  POSCO reported a 48.85 percent share of ownership in POSCO M-Tech.  POSCO AQR, Ex. 1 at 1.  At verification, Commerce determined that "POSCO exercises significant control" over POSCO M-Tech, and that, therefore, POSCO M-Tech is cross-owned.  I&D Mem. at 66; *see also* POSCO Verification Report at 12-13 (noting that [[                                                                                    ]]) (citation omitted).

POSCO sought to add more than two loans[26] as minor corrections.  *Id.*   Commerce

later rejected the corrections as not minor, and did not verify the new loans.  Request to

Take Action on Certain Barcodes (Apr. 21, 2016) at 1-2, CJA Tab 27, CR 442, PJA Tab

27, PR 394, ECF No. 79; I&D Mem. at 77 & nn.371-72 (citing POSCO Verification

Report at 25-26).

　　　*POSCO's Global R&D Center*

　　　While verifying that DWI was not located in an FEZ, Commerce learned that a

POSCO facility, named POSCO Global R&D Center (the "R&D facility"), "was listed on

the official Incheon FEZ government website as being located in the Incheon FEZ."  I&D

Mem. at 72-73; *see also* POSCO Verification Report at 2, 38-39.  When asked about

the R&D facility's "location and purpose," a POSCO official "presented a map printed

from a Korean website [with] a hand-drawn border surrounding what they claimed to be

the FEZ," which purported to show that the R&D facility was located outside the FEZ.

I&D Mem. at 73.  Commerce compared the hand-drawn map to the map from the

Incheon government website and noted several discrepancies.  *Id.*; *see also* POSCO

Verification Report at 38 (explaining that the hand-drawn boundary "was very small" and

included only a "few apartment buildings" in the FEZ, and no office buildings).

Commerce "offered repeatedly to visit the facility as depicted on the Korean government

website in order to clarify its location and confirm non-use of the FEZ program, but

---

[26] POSCO attempted to submit [[   ]] additional loans in this minor correction.  *See*
POSCO Verification Report at 3.

POSCO officials declined." I&D Mem. at 73. POSCO then concluded the verification. POSCO Verification Report at 39.

### 2. The Government of Korea

Commerce conducted verification of the GOK's questionnaire responses from March 14 to March 25, 2016. I&D Mem. at 2. Commerce did not, however, verify the GOK's provision of electricity for less than adequate remuneration; instead, the agency relied on the verification conducted as part of its investigation into corrosion-resistant steel ("CORE") from Korea. *See id*. at 42 & n.199 (citing Verification Documents to Proceeding (May 5, 2016) ("*CORE* Electricity Verification Report"), CJA Tab 31, CR 456-58, PJA Tab 31, PR 404, ECF No. 79).

### C. Final Determination and Amended Final Determination

In the *Final Determination*, Commerce announced a countervailing duty rate of 58.36 percent for POSCO. 81 Fed. Reg. at 49,944. Commerce calculated this rate after deciding to use adverse facts available with respect to certain subsidy programs. Specifically, Commerce concluded, as AFA, that POSCO and its cross-owned input suppliers benefited from certain specific subsidies. I&D Mem. at 10. Commerce found, as AFA, that the inputs produced by the four above-mentioned input suppliers were primarily dedicated to the production of the downstream product within the meaning of its attribution regulation, 19 C.F.R. § 351.525(b)(6)(iv). *Id*. at 69. Commerce also concluded, as AFA, that POSCO benefitted from the FEZ program, *id*. at 73, and that DWI benefitted from the KORES/KNOC lending program, *id.* at 76. For these reasons, Commerce concluded, as AFA, that "POSCO benefitted from the majority of programs

in the current investigation." *Id*. at 11; *see also id*. at 13-15 (identifying 45 programs for

which Commerce applied an AFA rate to POSCO).

With regard to selecting rates to use for these programs, Commerce explained

that "[i]t is the [agency's] practice in CVD proceedings to compute an AFA rate for non-

cooperating companies using the highest calculated program-specific rates determined

for a cooperating respondent in the same investigation, or, if not available, rates

calculated in prior CVD cases involving the same country." *Id*. at 12.  Commerce

selected its rates pursuant to the following hierarchical methodology:

> Specifically, [Commerce] applies the highest calculated rate for the
> identical subsidy program in the investigation if a responding company
> used the identical program, and the rate is not zero. If there is no identical
> program match within the investigation, or if the rate is zero, [Commerce]
> uses the highest non-*de minimis* rate calculated for the identical program
> in a CVD proceeding involving the same country. If no such rate is
> available, [Commerce] will use the highest non-*de minimis* rate for a
> similar program (based on treatment of the benefit) in another CVD
> proceeding involving the same country. Absent an above-*de minimis*
> subsidy rate calculated for a similar program, [Commerce] applies the
> highest calculated subsidy rate for any program otherwise identified in a
> CVD case involving the same country that could conceivably be used by
> the non-cooperating companies.

*Id*.

Commerce did not expressly state which hierarchical provision(s) it relied on in

this proceeding. *See id*. at 12-17.  For six programs, Commerce appears to have relied

on the first prong of its hierarchy to apply the highest non-zero rate calculated for

Hyundai Steel in this investigation.  *See id*. at 14-15 & nn.74, 79, 81, 83-84, 86.  For the

remaining 39 programs, Commerce applied one of two rates selected from other Korean

CVD proceedings.  *See id*. at 13-15 & nn.45-88.[27]  Specifically, Commerce applied a

1.65 percent rate associated with a GOK lending program found countervailable in

*Bottom Mount Combination Refrigerator-Freezers from the Republic of Korea*.  *See id*.

at 13-15 (noting the source of the rate); *id*. at 16-17 (noting the rate); *Bottom Mount*

*Combination Refrigerator-Freezers from the Republic of Korea*, 77 Fed. Reg. 17,410

(final aff. countervailing duty determination; 2010) (Dep't Commerce March 26, 2012)

("*Refrigerators from Korea*"), and accompanying Issues and Decision Mem., C-580-866

(March 16, 2012) ("*Refrigerators from Korea*, I&D Mem.") at 11-12.  Commerce also

applied a 1.05 percent rate associated with a tax deduction program found

countervailable in *Large Residential Washers from the Republic of Korea*.  *See* I&D

Mem. at 13-15 (noting the source of the rate); *id*. at 16-17 (noting the rate); *Large*

*Residential Washers from the Republic of Korea*, 77 Fed. Reg. 75,975 (final aff.

countervailing duty determination; 2011) (Dep't Commerce December 26, 2012)

("*Washers from Korea*"), and accompanying Issues and Decision Mem., C-580-869

(Dec. 18, 2012) ("*Washers from Korea*, I&D Mem.") at 14-15.

    Commerce also affirmed its preliminary determination that the GOK's provision of

electricity was not for less than adequate remuneration, and was not, therefore,

countervailable.  I&D Mem. at 45.

---

[27] At oral argument, the Government clarified that, depending on the program at issue in
this investigation, these rates fulfill one of the three remaining hierarchical prongs.  Oral
Arg. at 1:02:20-1:04:40.

In response to ministerial error comments submitted by POSCO, Commerce selected a different program rate for certain of POSCO's programs.  Resp. to Ministerial Error Cmts. Filed by Hyundai Steel Co. Ltd and POSCO (Aug. 24, 2016) ("Ministerial Error Mem.") at 3-4, CJA Tab 43, PJA Tab 43, PR 451, ECF No. 79.  Instead of the 1.65 percent rate derived from *Refrigerators from Korea*, Commerce selected a 1.64 percent rate associated with a K-SURE Short-Term Export Insurance program found countervailable in that proceeding.  *Id*. at 4; *Refrigerators from Korea*, I&D Mem. at 14-15.  Commerce also discovered that it had made an additional ministerial error by excluding a sub-program within POSCO's overall AFA rate.  Ministerial Error Mem. at 6.  Accordingly, POSCO's final subsidy rate increased to 59.72 percent.  *Am. Final Determination*, 81 Fed. Reg. at 64,437.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to § 516A(a)(2)(B)(i) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(i), and 28 U.S.C. § 1581(c).

The court will uphold an agency determination that is supported by substantial evidence and otherwise in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Huaiyin Foreign Trade Corp. (30) v. United States*, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting *Consol. Edison Co. v. NLRB.*, 305 U.S. 197, 229 (1938)).  It "requires more than a mere scintilla," but "less than the weight of the evidence."  *Nucor Corp. v. United States*, 34 CIT 70, 72, 675 F. Supp. 2d 1340, 1345 (2010) (quoting *Altx, Inc. v. United States*, 370 F.3d 1108, 1116 (Fed. Cir. 2004)).

The court may not "reweigh the evidence or . . . reconsider questions of fact anew."

*Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1377 (Fed. Cir. 2015)

(quoting *Trent Tube Div., Crucible Materials Corp. v. Avesta Sandvik Tube AB*, 975 F.2d

807, 815 (Fed. Cir. 1992)).

DISCUSSION

I.   **POSCO's Rule 56.2 Motion for Judgment upon the Agency Record**

    **A. Commerce's AFA Determinations**

POSCO challenged three applications of AFA.  Each is discussed, in turn.

      **1. Inputs from Affiliated Suppliers**

        **a.  Parties' Contentions**

POSCO contends that Commerce erred in finding that it had failed to cooperate

to the best of its ability when it declined to report inputs from four affiliates because

POSCO held an objectively reasonable belief that those inputs were not primarily

dedicated to the production of the downstream product (hereinafter referred to as

"primarily dedicated") and, thus, a response was not required.  *See* POSCO Mot. at 19-

22; Confidential Reply Br. of Pl. POSCO in Supp. of its Mot. for J. Upon the Agency R.

("POSCO Reply") at 8-9, ECF No. 73.  According to POSCO, any finding that it should

have disclosed inputs from these companies supported only the application of facts

otherwise available and not an adverse inference.  *See* POSCO Mot. at 21-22.  POSCO

further contends that Commerce's adverse inference that the inputs produced by its

affiliates were primarily dedicated was contradicted by substantial evidence that

Commerce failed to consider.  POSCO Mot. at 18-19 (citing *Changzhou Trina Solar*

*Energy Co., Ltd. v United States*, 40 CIT \_\_\_, \_\_\_, 195 F. Supp. 3d 1334, 1350 (2016));
POSCO Reply at 5.

The Government contends that Commerce's determination to rely on adverse
facts available for POSCO's failure to report inputs it received from four cross-owned
companies is adequately supported.  *See* Gov. Resp. at 28-32.  The Government
argues that POSCO's reason for withholding the information is "irrelevant"; "[b]ecause
POSCO was able to provide more information than it did, POSCO did not put forth its
'maximum' efforts to comply with Commerce's questionnaires."  *Id*. at 30 (citing *Nippon
Steel*, 337 F.3d at 1382).  The Government further contends that Commerce correctly
rejected POSCO's argument that the inputs were not primarily dedicated.  *Id*. at 32.  It
asserts that POSCO has ignored the fact that the information POSCO seeks to rely on
was not verified, and POSCO has misunderstood Commerce's regulation governing the
attribution of subsidies of an input supplier to a downstream producer.  *Id*. at 34-36.

Petitioner Defendant-Intervenors contend that POSCO may not withhold
information requested based on legal conclusions it has drawn from that information.
Pet'r Def.-Int. Resp. at 3-5.  Petitioner Defendant-Intervenors note that POSCO did not
inform Commerce that it was responding to its questionnaires based on its own
"reasonable belief" that it need not provide the information, but instead stated
unequivocally that it had no affiliated Korean companies supplying inputs to the
production of the subject merchandise.  *Id*. at 5-6 (citing POSCO AQR at 4, 5 & Ex. 1 at
1).  Petitioner Defendant-Intervenors further contend that POSCO's arguments
regarding "the merits of the 'primarily dedicated' issue should be foreclosed by its failure

to disclose [the] requested information," and that they nevertheless "fail because they are based on a mischaracterization of Commerce's attribution rules and practice." *Id*. at 7.

### b. Analysis

As an initial matter, substantial evidence supports Commerce's decision to apply facts available. The statute provides that Commerce shall rely on the facts available when a respondent withholds requested information, "significantly impedes a proceeding," or provides information after the deadline for submission. 19 U.S.C. § 1677e(a)(2). Here, Commerce relied on facts available on the basis of POSCO's inaccurate questionnaire responses and the "conflicting information discovered at verification." I&D Mem. at 10.

There is no dispute that POSCO withheld information regarding its cross-owned input suppliers in its questionnaire responses. *See* POSCO AQR at 4-5; POSCO 2nd Suppl. QR at 1. At verification, Commerce discovered that POSCO's affiliates supplied limestone, scrap, ferro-molybdenum, and high purity ferro-manganese for use in producing POSCO's cold-rolled steel. POSCO Verification Report at 5-17; POSCO Verification Ex. 3 at ECF pp. 92-94. POSCO's inaccurate questionnaire responses and untimely submission of new factual information at verification prevented Commerce from fully examining the extent to which POSCO's affiliates benefitted from subsidies attributable to POSCO. *See* I&D Mem. at 64-65. There is, thus, substantial evidence on the record demonstrating that POSCO withheld information, failed to timely provide information, and impeded the proceeding pursuant to 19 U.S.C. § 1677e(a).

Substantial evidence further supports Commerce's decision to apply an adverse inference, which was otherwise in accordance with law.  Commerce "may use an inference that is adverse to the interests of [a respondent] in selecting from among the facts otherwise available" when the respondent "fail[s] to cooperate by not acting to the best of its ability to comply with a request for information."  19 U.S.C. § 1677e(b)(1)(A). Here, Commerce concluded that POSCO had failed to act to the best of its ability because it "failed to report the necessary information and only after discovery at verification did it report on the last day that some of the inputs provided by . . . affiliated companies were, in fact, used in the production of the subject merchandise."  I&D Mem. at 68-69 & nn.327-31 (citing *Nippon Steel*, 337 F.3d at 1380, 1382; POSCO Verification Report at 5-17); *see also id*. at 10 (an adverse inference was merited because, "[d]espite repeated requests, POSCO failed to identify or provide necessary information as to its respective cross-owned companies").  At issue here is the subjective prong of the *Nippon Steel* test; i.e., whether Commerce has shown that POSCO's failure to supply the requested information "[was] the result of [POSCO's] lack of cooperation in . . . failing to put forth its maximum efforts to investigate and obtain the requested information from its records."  *Nippon Steel*, 337 F.3d at 1382-83.[28]

---

[28] POSCO does not contend that Commerce has failed to make the requisite "objective showing that a reasonable and responsible importer would have known that the requested information was required to be kept and maintained under the applicable statutes, rules, and regulations."  *Nippon Steel*, 337 F.3d at 1382; *see also* POSCO Mot. at 13-14 (generally contending that POSCO's decision not to report the affiliate-supplied inputs was "not due to a failure to cooperate by not acting to the best of its ability").

Commerce's questionnaire was framed in general terms; it did not expressly limit POSCO's scope of response to only those suppliers that provided inputs POSCO considered primarily dedicated for purposes of Commerce's attribution regulation.  *See* POSCO AQR at 4-5.  Commerce reasonably expected POSCO to have provided the affiliated supplier information in its questionnaire response or to have informed Commerce of its basis for withholding the information so that Commerce could investigate POSCO's position.  *See* I&D Mem. at 64 ("If POSCO had explained that it was not providing information on certain companies because they were not primarily dedicated in the affiliated questionnaire response, [Commerce] would have had the opportunity to follow-up on this claim.").  Instead, POSCO unequivocally stated that no Korean affiliates supplied inputs for the production of subject merchandise.  POSCO AQR at 5; *see also* POSCO 2nd Suppl. QR at 1 (affirming "that it believes it has provided responses for all cross-owned companies that fall within 19 C.F.R. § 351.525(b)(6)," without informing Commerce about the basis for its belief).[29]  POSCO

---

[29] At oral argument, the court asked the Government whether the phrasing of Commerce's second supplemental questionnaire to POSCO and its verification agenda undermine the Government's argument that POSCO withheld information.  *See* Letter to Counsel (Nov. 21, 2017) ¶ 1(c), ECF No. 86; POSCO 2nd Suppl. QR at 1 (directing POSCO to "confirm [that is has] provided responses for all cross-owned companies that fall within 19 CFR [§] 351.525(b)(6)"); POSCO Verification Agenda at 6 (directing POSCO to "[b]e prepared to demonstrate that none of POSCO's other affiliated companies provided inputs for the production of cold-rolled steel *or otherwise would fall under our attribution regulations*").  The Government responded that it prepared the second supplemental questionnaire and verification agenda in light of POSCO's affiliated questionnaire response.  *See* Oral Arg. at 36:33-37:13.  The Government also noted that, in contrast, POSCO did inform Commerce about affiliated input suppliers located outside Korea and thereby demonstrated some analysis of the attribution regulation.  *See id.* at 36:05-36:32; POSCO AQR at 5.  The court agrees.  POSCO's

reiterated its position at verification, and it was not until Commerce obtained a list of

POSCO's input suppliers that it learned that POSCO had provided inaccurate

information.  POSCO Verification Report at 16-17; I&D Mem. at 9 & n.30 (citing POSCO

Verification Ex. 3).

POSCO acknowledges that it withheld information about its affiliated input

suppliers on the basis of its own belief about the relevance of the information.  *See,*

*e.g.*, POSCO Mot. at 13-14, 19-22; POSCO Case Br. at 12.  POSCO's conduct,

therefore, may not precisely constitute a failure to exert "maximum efforts to investigate

and obtain the requested information from its records," *Nippon Steel*, 337 F.3d at 1382-

83, because POSCO apparently had the information, but chose not to provide it.

Nevertheless, the Federal Circuit further stated that "intentional conduct, such as

deliberate concealment or *inaccurate reporting*, surely evinces a failure to cooperate."

*Nippon Steel*, 337 F.3d at 1383 (emphasis added).  For example, "[p]roviding false

information and failing to produce key documents unequivocally demonstrate [a

respondent's failure to] put forth its maximum effort."  *Essar Steel I*, 678 F.3d at 1275–

76 (citing *Nippon Steel*, 337 F.3d at 1383) (affirming Commerce's determination to apply

adverse facts available on the basis of respondent's assertions regarding the absence

of manufacturing plants in a particular location and record evidence contradicting that

---

qualified response regarding non-Korean input suppliers supports Commerce's
understanding that POSCO's response regarding Korean input suppliers was
unqualified.  Accordingly, the phrasing of the second supplemental questionnaire and
verification agenda does not fairly detract from the evidence supporting Commerce's
determination.  *See Nippon Steel*, 337 F.3d at 1379.

assertion).[30]  Here, "Commerce requested information from [POSCO], which [POSCO]

did not provide and never claimed that it was unable to provide."  *Maverick Tube Corp.*

*v. United States*, 857 F.3d 1353, 1360-61 (Fed. Cir. 2017) (affirming application of

adverse facts available when respondent had withheld information it had access to on

the basis that it deemed it unnecessary to Commerce's determination).  "Such behavior

cannot be considered 'maximum effort to provide Commerce with full and complete

answers.'"  *Id*. (quoting *Nippon Steel*, 337 F.3d at 1382).

POSCO's reliance on its purported objectively reasonable belief about the

irrelevance of the inputs is unavailing.  *See* POSCO Mot. at 19-22; POSCO Reply at 8-

9.  Although Commerce's regulations speak to the attribution of subsidies obtained by a

cross-owned "input supplier and a downstream producer" when "the input product is

primarily dedicated to production of the downstream product," 19 C.F.R.

---

[30] For this reason, POSCO's argument that Commerce's narrative explanation
potentially supported the application of facts available, but without an adverse inference,
is also unavailing.  *See* POSCO Mot. at 21-22.  POSCO contends that its failure to
report information "does not alone demonstrate that POSCO failed to act to the best of
its ability," and that Commerce "does not explain how this reporting deficiency
constitutes 'circumstances in which it is reasonable to conclude that less than full
cooperation has been shown.'"  *Id*. at 21-22 (quoting *Nippon Steel*, 337 F.3d at 1383).
Commerce may not have used those precise words in articulating its reasons for
applying adverse facts available; however, the court will uphold Commerce's
determination when the path to that determination is reasonably discernable from the
determination itself.  *See NMB Singapore Ltd. v. United States,* 557 F.3d 1316, 1319
(Fed. Cir. 2009).  Commerce relied on POSCO's repeated refusal to provide the
supplier information, its failure to inform Commerce of the reason for its withholding so
that Commerce could further investigate, and the belated discovery of contradictory
information.  *See* I&D Mem. at 9-10, 64, 68-69.  In such circumstances Commerce
reasonably concluded that POSCO did not demonstrate full cooperation and adverse
facts available was warranted.

§ 351.525(b)(6)(iv), Commerce's questionnaire went further, directing POSCO to

"[s]pecify whether an affiliated company supplies inputs into your company's production

processes," POSCO AQR at 4; *see also* Pet'r Def.-Int. Resp. at 4-5 (noting the

distinction between the regulation and the questionnaire).[31]  This is fitting given

Commerce's responsibility to determine, based on the information respondents provide,

whether subsidies should be attributed to cross-owned affiliates.  *See* 19 C.F.R.

§ 351.525(b)(6)(iv) (when certain circumstances are present, "*the Secretary* [i.e.

---

[31] POSCO asserts that Petitioner Defendant-Intervenors "read too much into the language of the questionnaire."  POSCO Reply at 10.  According to POSCO,

> [u]nder [Petitioner] Defendant-Intervenors' interpretation, even [when] the evidence indisputably shows that the inputs . . . are not primarily dedicated . . ., the respondent should be hit with AFA if it failed to disclose the existence of the cross-owned input supplier in its questionnaire response.  That is an absurd result, and one that is squarely at odds with the regulation and Commerce's obligation to calculate margins as accurately as possible.  A sin of omission should not trump the actual facts.

*Id.*  POSCO is incorrect.  Petitioner Defendant-Intervenors read nothing into the questionnaire; the questionnaire plainly asked POSCO to identify any affiliates supplying inputs for its production processes.  *See* POSCO AQR at 4.  Moreover, POSCO's argument ignores the fact that "[i]t is Commerce, not the respondent, that determines what information is to be provided."  *Ansaldo Componenti, S.p.A. v. United States*, 10 CIT 28, 37, 628 F. Supp. 198, 205 (1986).  A respondent's refusal to provide requested information may indeed expose it to the use of adverse facts available regardless of the respondent's alleged basis for considering the information irrelevant.  *See, e.g.*, *Reiner Brach GmbH & Co.KG v. United States*, 26 CIT 549, 555–64, 206 F. Supp. 2d 1323, 1330–38 (2002).  Commerce's obligation to calculate accurate margins cannot be separated from a respondent's obligation to submit accurate information.  "[T]he purpose of the adverse facts statute," which "is 'to provide respondents with an incentive to cooperate' with Commerce's investigation," *Maverick Tube*, 857 F.3d at 1360 (quoting *Essar Steel I*, 678 F.3d at 1276), therefore assists Commerce to fulfill its statutory mandate to determine margins "as accurately as possible" under the antidumping and countervailing duty statutes, *Lasko Metal Prods, Inc. v. United States*, 43 F.3d 1442, 1443 (Fed. Cir. 1994).  POSCO's argument essentially amounts to a defense of a respondent's prerogative to withhold factual information whenever it decides the information lacks legal significance, thereby usurping the agency's role.

Commerce] will attribute subsidies received by the input producer to the combined sales of the input and downstream products") (emphasis added); I&D Mem. at 67 (explaining that it is for Commerce to determine whether inputs are primarily dedicated).  Thus, "[r]egardless of whether [POSCO] deemed the [] information relevant, it nonetheless should have produced it [in] the event that Commerce reached a different conclusion." *Essar Steel*, 34 CIT at 1073, 721 F. Supp. 2d at 1299 (AFA merited when respondent withheld requested information on the basis of its belief that the information was irrelevant to Commerce's CVD determination); *see also Reiner Brach*, 26 CIT at 555-64, 206 F. Supp. 2d at 1330–38 (adverse facts available merited when respondent failed to provide information regarding all home market sales of identical and similar merchandise on the basis of its own interpretation of the statutory definition of "foreign-like product," even though Commerce had requested information about "'all' home market sales [] for 'identical or similar merchandise'").

POSCO's related assertion that Commerce's reliance on adverse facts available is unsubstantiated because POSCO accurately responded to Commerce's questionnaire is also unavailing.  *See* POSCO Mot. at 13-19 (arguing that evidence establishes that the unreported inputs were not primarily dedicated).  First, it bears repeating that Commerce did not limit its inquiry to only those inputs POSCO deemed primarily dedicated.  *See, e.g.*, POSCO AQR at 4.  Second, as discussed below, POSCO's evidentiary argument also fails.

To support its argument, POSCO points to two categories of information: (1) the respective proportion of each affiliates' sales of their inputs to POSCO as a percentage

of their total sales, and (2) the respective proportion of each affiliates' total sales to

POSCO as a portion of their total sales.  *See* POSCO Mot. at 16-18; POSCO Case Br.

at 13-19; POSCO's Rebuttal Br. (May 25, 2016) at 10-19, CJA Tab 35, CR 462-63, PJA

Tab 35, PR 424-25, ECF No. 79.  Commerce addressed the first category of

information, but not the latter.  *See* I&D Mem. at 66-67.  The court will discuss both.

In the Issues and Decision Memorandum, Commerce explained its rejection of

POSCO's reliance on the amount of each input sold to POSCO on the basis that

POSCO had untimely attempted to submit that factual information at verification.  *See*

I&D Mem. at 66-67 & nn.315-318 (citing POSCO Verification Report at 5-17; POSCO

Verification Ex. 3 at ECF pp. 92-94; *Countervailing Duty Investigation of Certain*

*Corrosion-Resistant Steel Products From India*, 81 Fed. Reg. 35,323 (Dep't Commerce

June 2, 2016) (final aff. determination; 2014) ("*CORE from India*"), and accompanying

Issues and Decision Mem., C-533-864 (May 24, 2016) ("*CORE from India*, I&D Mem.")

at Cmt. 11).[32]  For that reason, Commerce did not verify the input amounts POSCO

sought to rely upon.  *See* I&D Mem. at 67.  POSCO argues that Commerce's failure to

verify the information "does not undermine [its] accuracy or reliability" because

---

[32] Commerce characterizes POSCO's argument as asserting that the inputs "were not primary dedicated to [the] *subject merchandise* because only a small amount of the inputs were used in the production of the *subject merchandise*."  I&D Mem. at 67 (emphasis added).  Commerce explains that the issue "is not whether an input is primarily dedicated to the subject merchandise, but to the downstream product," which may be "an intermediate input to the subject merchandise."  *Id*. at 67-68.  In fact, however, POSCO argued that the inputs were not primarily dedicated to the production of the *downstream product*, not the subject merchandise.  *See, e.g.*, POSCO Case Br. at 10-12.

Commerce "has discretion to decide what to verify, and if it chooses not to verify an

item, then the item is considered accurate."  POSCO Mot. at 16 n.2 (citing *Certain Oil*

*Country Tubular Goods From the Republic of Turkey*, 79 Fed. Reg. 41,964 (Dep't

Commerce July 18, 2014) (final aff. countervailing duty determination and final aff.

critical circumstances determination; 2012) ("*OCTG from Turkey*"), and accompanying

Issues and Decision Mem., C-489-817 (July 10, 2014) ("*OCTG from Turkey*, I&D

Mem.") at Cmt. 9).  POSCO also argues that *CORE from India* is inapposite because

Commerce issued the decision after POSCO's verification, and because the decision

does not discuss Commerce's approach to primary dedication as applied in past cases.

POSCO Reply at 6-7 (citing *Washers from Korea*, I&D Mem. at 3; *Certain Softwood*

*Lumber Products From Canada*, 67 Fed. Reg. 67,388 (Dep't Commerce Nov. 5, 2002)

(final results and partial rescission of countervailing duty expedited reviews; 2000-2001)

("*Lumber from Canada*"), and accompanying Issues and Decision Mem., C-122-839

(undated) ("*Lumber from Canada*, I&D Mem.") at 23).

　　　　First, Commerce had notified POSCO that "verification is not intended to be an

opportunity for the submission of new factual information."  POSCO Verification Agenda

at 2.  Indeed, "[v]erification is intended to test the accuracy of data already submitted,

rather than to provide a respondent with an opportunity to submit a new response."

*Tianjin Mach. Import & Export Corp. v. United States*, 28 CIT 1635, 1644, 353 F. Supp.

2d 1294, 1304 (2004), *aff'd*, 146 F. App'x 493 (Fed. Cir. 2005).  Accordingly, Commerce

did not err in declining to rely on this new information in the *Final Determination*.  *See*

19 U.S.C. 1677m(i)(1) (Commerce "shall verify all information relied upon in making . . . a final determination in an investigation").

Second, POSCO misconstrues *OCTG from Turkey*.  Therein, Commerce chose not to verify information the Government of Turkey ("GOT") submitted before verification because it had accepted the "accuracy of th[at] information . . . on its face."  *OCTG from Turkey*, I&D Mem. at 54.  Commerce explained that "unless the GOT planned to provide new factual information at verification or claim that its own submissions were false, then verification would have no effect on the final determination."  *Id.*  In contrast, here, at verification POSCO presented information that contradicted its previous questionnaire responses, the accuracy of which Commerce never accepted.  *See* I&D Mem. at 64-68 (explaining several times that POSCO's belated presentation of factual information prevented Commerce from fully examining it, rendering the information "unsubstantiated" and "unreliable").  *OCTG from Turkey* does not, therefore, stand for the proposition that any information Commerce chooses not to verify, regardless of when it is first presented to the agency, must be deemed accurate.[33]

Third, in *CORE from India*, although Commerce explained that its attribution regulations "do not contemplate the amount of the input provided by a supplier as a

---

[33] POSCO disputes Commerce's assertion that a "large amount of analysis" was "required to verify the [new] data."  POSCO Mot. at 16 n. 2 (quoting I&D Mem. at 67). Particularly in light of the fact that Commerce did not obtain this new information until the last day of verification, *see* I&D Mem. at 67, Commerce did not abuse its discretion in declining to verify the information, *see, e.g.*, *Micron Tech., Inc. v. United States*, 117 F.3d 1386, 1396 (Fed. Cir. 1997) (holding that Commerce's verification procedures are reviewed for an abuse of discretion).

gauge for whether that company should submit a response," as here, Commerce

applied adverse facts available for the respondent's failure to report an affiliated input

supplier.  *CORE from India*, I&D Mem. at 33.  In so doing, Commerce rejected the

respondent's argument "that the amount of the input involved is small" because

Commerce did "not consider the data collected to be complete and verified."  *Id.*  Thus,

Commerce had "no basis on which to conclude that the inputs . . . [were] mere

insignificant adjustments."  *Id.*  Accordingly, *CORE from India* is consistent with

Commerce's decision to reject POSCO's opinion on primary dedication in the absence

of timely submitted data from the respondent.  *See* I&D Mem. at 67.

     Fourth, POSCO's reliance on *Washers from Korea* and *Lumber from Canada* is

unavailing.  In *Washers from Korea*, Commerce based its primary dedication

determination on the small amount of the affiliates' sales of inputs to the respondent as

a proportion of their total sales, *and* that most of the affiliates' products are used to

produce a variety of products that are sold to customers other than the respondent.

*See Washers from Korea*, I&D Mem. at 3 (citing *CVD Preamble*, 63 Fed. Reg. at

65,401).  In *Lumber from Canada*, Commerce declined to attribute subsidies when "less

than 30 percent of [the affiliate's] timber sales [were] made to [the lumber producer]"

and "all other sales [were] made to unrelated customers."  *Lumber from Canada*, I&D

Mem. at 23.  Accordingly, relative sales of the input to the respondent is not

Commerce's only consideration in the analysis of whether an input is primarily

dedicated, and POSCO's failure to report its affiliated input suppliers prevented

Commerce from investigating and obtaining other pertinent information.  Further, the

respondents in *Washers from Korea* and *Lumber from Canada* timely provided the

information, thereby affording Commerce the opportunity to examine or verify it and

allowing the agency, not the respondent, to make the decision on primary dedication.

*See Washers from Korea*, I&D Mem. at 3; *Lumber from Canada*, I&D Mem. at 23.

These determinations do not, therefore, support POSCO's decision to withhold that

information from its questionnaire response on the basis of its own conclusion regarding

primary dedication.  *See* POSCO Reply at 7 (contending these rulings afforded POSCO

a reasonable basis for withholding the information).[34]

Finally, POSCO's reliance on *Changzhou Trina Solar* is also unavailing.  *See*

POSCO Mot. at 18-19 (citing *Changzhou Trina Solar*, 195 F. Supp. 3d at 1350).  There,

the court faulted Commerce for failing to point to *any* record evidence to support the

adverse inference that several programs, some of which were discovered at verification,

were "specific," provided a "financial contribution," and "conferred a 'benefit,'" as those

terms are statutorily defined.  *Changzhou Trina Solar*, 195 F. Supp. 3d at 1347

---

[34] At oral argument, POSCO sought to distinguish the respondent's decision to report its affiliate's sales of timber in *Lumber from Canada* on the basis that primary dedication was at issue in that case.  *See* Oral Arg. at 50:07-50:57.  In contrast, here, POSCO asserted, primary dedication was not at issue because its affiliates supplied only trace elements.  *Id.* at 54:00-54:13 (comparing the 30 percent figure in *Lumber from Canada* to the much smaller amount of POS HiMetal's sales of high purity ferro-manganese to POSCO as a percentage of its total sales).  POSCO's distinction is speculative; there is nothing in *Lumber from Canada* to suggest that the respondent premised its decision to submit a questionnaire response on the affiliate's proportion of sales, or to otherwise support POSCO's decision to withhold information on that basis.  Moreover, the issue here is not whether POSCO's affiliates' inputs *were* primarily dedicated, but whether Commerce's decision to draw that *adverse inference* as a result of POSCO presenting inaccurate and incomplete information about its affiliated suppliers is supported by substantial evidence.

("Although the bar is low—Commerce may use 'any . . . information placed on the

record,' . . . —it is not non-existent." (quoting 19 U.S.C. § 1677e(b)(2)(D)); *id.* at 1348

(noting that "Commerce [] placed no relevant factual information on record" or "indicated

that it relied on any information, from any source" in drawing its adverse inference).

　　*Changzhou Trina Solar* involved the countervailability of the alleged subsidies.  In

contrast, here, POSCO does not challenge the countervailability of the subsidies

allegedly received by its affiliates, but the adverse inference that its affiliated-supplier

inputs were primarily dedicated pursuant to Commerce's attribution regulation, such that

those subsidies may be attributed to POSCO.  *See* POSCO Mot. at 14-19; POSCO

Reply at 3-6.  The common issue, however, is whether Commerce's adverse inference

bears some evidentiary support.  Unlike *Changzhou Trina Solar*, here, Commerce relied

on record evidence demonstrating that POSCO Chemtech, POSCO P&S, POSCO M-

Tech, and POSCO Hi-Metal are cross-owned by POSCO pursuant to 19 C.F.R.

§ 351.525(b)(6), and that they supplied inputs used to produce cold-rolled steel.  *See*

I&D Mem. at 9, 65; POSCO Verification Ex. 3 at ECF pp. 92-94; POSCO Verification

Report at 10-14; POSCO AQR, Ex. 1 at 1.  Commerce's adverse inference, therefore,

complied with statutory and regulatory requirements.  *See* 19 U.S.C. § 1677e(b)(2)(D)

(stating that an adverse inference may be drawn from "any [] information placed on the

record"); 19 C.F.R. § 351.308(c)(2)(2015).[35]

---

[35] The court in *Changzhou Trina Solar* distinguished the facts of that case from another
case involving the use of adverse facts available.  195 F. Supp. 3d at 1348 (citing *RZBC*
*Grp. Shareholding Co. v. United States*, 39 CIT ___, ___, 100 F. Supp. 3d 1288, 1294-
97 (2015)).  In *RZBC*, the court affirmed Commerce's finding that a particular subsidy

The quantity of the respective inputs sold by the affiliates to POSCO (in absolute terms and as a proportion of the affiliates' sales) does not "'fairly detract' from the reasonableness of [Commerce's] conclusion[]." *Changzhou Trina Solar*, 195 F. Supp. 3d at 1350 (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951) (alteration omitted)).  As noted above, that information was supplied by POSCO on the last day of verification, leaving Commerce no time to examine or verify it.  *See* I&D Mem. at 67.  Using untimely and, therefore, unverified information to impugn Commerce's determination would create a significant loophole in Commerce's deadlines for the submission of factual information.  *See* 19 C.F.R. § 351.301.[36]

As to POSCO's second category of information, data regarding each affiliate's total material sales to POSCO as a percentage of its total sales was on the record from the time of POSCO's initial questionnaire response.  *See* POSCO IQR, Ex. 12 (POSCO's 2013-2014 Audited Non-Consolidated Financial Statements), Note 37(a)

---

was "specific" on the basis of an adverse inference derived from information in the petition.  100 F. Supp. 3d at 1294, 1296-1300; *see also Changzhou Trina Solar*, 195 F. Supp. 3d at 1348; 19 U.S.C. § 1677e(b)(2)(A) (permitting Commerce to rely on information derived from the petition).  Commerce drew the adverse inference in light of the Government of China's failure to provide the statistical data required to make the determination.  *RZBC*, 100 F. Supp. 3d at 1296-97.  Accordingly, this case is more like *RZBC* than *Changzhou Trina Solar*.

[36] POSCO argues that Commerce cannot accept at verification an exhibit detailing the inputs its affiliates sold to POSCO and "rely upon that information as the basis for its AFA determination," while refusing to consider the specific information because it was unverified.  POSCO Reply at 4 ("Commerce cannot have it both ways.").  There is a difference, however, between relying on the *existence of the evidence* to conclude that adverse facts available is merited, i.e., information demonstrating that POSCO withheld information showing that the affiliates supplied the inputs, and the *specific content thereof*, i.e., the input amounts.  Commerce explained that it did not verify the input amounts provided.  *See* I&D Mem. at 67.

(supplying POSCO's total purchases of material from its subsidiaries) and Ex. 20

(POSCO's 2013-2014 Audited Consolidated Financial Statements), Note 1(c) (supplying

each affiliate's total sales).  Commerce did not discuss this evidence.  *See* I&D Mem. at

64-69.  That omission, however, is not fatal.[37]

       The facts available provisions of the statute allow Commerce to fill gaps in the

record and, when necessary conditions have been met, to do so with an adverse

inference.  "When key data are missing from the record . . .  Commerce can take proof

from the far reaches of the record to close evidentiary gaps that the parties never filled."

*RZBC*, 100 F. Supp. 3d at 1298; *see also Hebei Jiheng Chemicals Co., Ltd. v. United

States*, 40 CIT ___, ___, 161 F. Supp. 3d 1322, 1331 (2016) ("Commerce . . . has broad

'discretion to choose which sources and facts it will rely on to support an adverse

inference . . . .'") (quoting *F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United

States,* 216 F.3d 1027, 1032 (Fed. Cir. 2000)).

       POSCO essentially argues that Commerce should have filled the primary

dedication gap by way of an inference drawn from its proffered and *potentially* favorable

facts.  *See, e.g.*, POSCO Mot. at 16-18.[38]  But when, as here, a respondent fails to

---

[37] Commerce is not required to "make an explicit response to every argument made by a party"; however, it is required to discuss "issues material to [its] determination." *Timken U.S. Corp. v. United States*, 421 F.3d 1350, 1354 (Fed. Cir. 2005) (citation omitted).

[38] None of the proceedings upon which POSCO seeks to rely discuss the total sales of an affiliate to the respondent as a percentage of the affiliate's total sales to all customers as a measure of primary dedication.  *See Washers from Korea*, I&D Mem. at 3; *Lumber from Canada*, I&D Mem. at 23.  Accordingly, any conclusion on primary dedication to be drawn from such information requires an inference that the total sales of all materials bears a relationship to the total sales of a particular input.

cooperate by not acting to the best of its ability, the statute permits Commerce to "use

an inference that is *adverse* to the interests of that party in selecting from among the

facts otherwise available." 19 U.S.C. § 1677e(b)(1)(A) (emphasis added). This ensures

that a "party does not obtain a more favorable result by failing to cooperate than if it had

cooperated fully." Uruguay Round Agreements Act, Statement of Administrative Action,

H.R. Doc. No. 103-316, vol. 1, at 870 (1994), *reprinted in* 1994 USCCAN 4040, 4199

("SAA").[39] Accordingly, POSCO's argument is unavailing. Commerce is not required to

look elsewhere in the record for allegedly exculpatory information or to credit such

information when the use of an adverse inference is otherwise justified. Commerce's

decision to apply adverse facts available for POSCO's failure to report its affiliated input

suppliers is supported by substantial evidence and is otherwise in accordance with law.

### 2. POSCO's R&D Facility

#### a. Parties' Contentions

POSCO contends that Commerce wrongly decided to apply adverse facts

available for its failure to report a facility located in an FEZ because the Government of

Korea reported that POSCO did not receive any benefits from having such a facility

during the "investigation period." POSCO Mot. at 36-39 (citing GOK QR at 108);

POSCO Reply at 17-19. POSCO asserts that the GOK's reference to "investigation

---

[39] The SAA "shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application." 19 U.S.C. § 3512(d).

period" reasonably means "the entire [average useful life ("AUL") period of the subject merchandise], including the POI."  POSCO Mot. at 38.[40]

The Government contends that Commerce's decision to apply adverse facts available for POSCO's failure to report this R&D facility is supported by substantial evidence, as is Commerce's decision to draw the adverse inference that POSCO benefitted from the FEZ program.  Gov. Resp. at 38-39, 41.  The Government further contends that Commerce correctly determined that the reference to "investigation period" was ambiguous, and record evidence demonstrates that the phrase may have been limited to the POI, undermining POSCO's argument that the GOK's response demonstrated that POSCO received no benefit from having a facility located in an FEZ. *Id*. at 40.

Petitioner Defendant-Intervenors contend that record evidence demonstrates the FEZ program's countervailability.  Pet'r Def.-Int. Resp. at 16 (citing CVD Investigation Initiation Checklist (Aug. 17, 2015) at 28, CJA Tab 2, CR 25-29, PJA Tab 2, PR 46-50, ECF No. 77).  Petitioner Defendant-Intervenors further contend that the GOK's response "cannot remedy POSCO's inaccurate reporting of its own facilities and benefits."  *Id*. at 17.

### b.  Analysis

Commerce's determination to apply adverse facts available for POSCO's failure to report the R&D facility is supported by substantial evidence and is otherwise in

---

[40] The AUL of the subject merchandise is 15 years.  Prelim. Mem. at 8; Gov. Resp. at 40.

accordance with law.  Here, POSCO reported that it "has no facilities located in a [FEZ] and thus was not eligible for and did not receive any tax reductions, exemptions, grants or financial support under any of the [] programs listed in [Commerce's] question." POSCO IQR at 52.  However, at verification, Commerce learned that POSCO's R&D facility is listed on an official GOK website as being located in an FEZ.  I&D Mem. at 73-74; POSCO Verification Report at 38.  When asked to clarify the purpose and location of the R&D facility, POSCO provided a hand-drawn map contradicting the official map, and refused to accompany Commerce to the R&D facility so that it could gather additional information.  I&D Mem. at 73; POSCO Verification Report at 39.  Accordingly, Commerce reasonably determined that POSCO had failed to put forth its maximum efforts to provide the requested information.  *Cf. Essar Steel I*, 678 F.3d at 1275–76 (affirming Commerce's determination to apply adverse facts available on the basis of respondent's assertions regarding the absence of manufacturing plants in a particular location and record evidence contradicting that assertion).

Commerce's adverse inference that POSCO benefitted from the FEZ program is also supported by substantial record evidence.  Commerce relied on evidence that POSCO had a facility within an FEZ.  POSCO Verification Report at 38-39.  Commerce further explained that because the GOK did not clarify whether its reference to the "investigation period" in its response meant the POI or the entire 15-year AUL of the subject merchandise, I&D Mem. at 73-74, POSCO does "not have an affirmative claim of non-use for [the FEZ] program for the remainder of the 15-year AUL period from the GOK."  *Id.* at 81 (noting that the GOK uses "investigation period" to refer to the POI

"throughout its initial questionnaire response").[41]  Commerce also relied on record

evidence demonstrating that POSCO could have benefited from the FEZ program,

which was designed to attract foreign investment, because "certain shareholders of

POSCO [are] foreign."  I&D Mem. at 74; *see also* GOK QR, Ex. FEZ-1 (promotional

brochure discussing foreign investment incentives associated with Korean FEZ).

POSCO essentially asks the court to reweigh the evidence, which it cannot do.  *See*

POSCO Mot. at 38 ("A passing reference on a Korean website is not substantial

evidence that would support the application of AFA in this instance, particularly in light

of the GOK's certified statement that POSCO did not receive any FEZ benefits.");

*Downhole Pipe & Equip.,* 776 F.3d at 1377.  Commerce's decision to apply adverse

facts available for POSCO's failure to report the R&D facility located within an FEZ, and

the adverse inference upon which Commerce relied, are supported by substantial

evidence and are otherwise in accordance with law.

### 3.  DWI's Loans

POSCO contends that Commerce erred in rejecting the additional KORES loans

as minor corrections and in applying adverse facts available for DWI's failure to report

---

[41] There are two types of benefits associated with countervailable subsidies: recurring
and non-recurring.  Commerce allocates recurring benefits to the year in which they
were received.  19 C.F.R. § 351.524(a).  Commerce allocates non-recurring benefits
"over the number of years corresponding to the [AUL] of renewable physical assets"
used in the production of the subject merchandise.  19 C.F.R. § 351.524(b); Prelim.
Decision Mem. at 8; Gov. Resp. at 39-40.  Thus, the GOK's reference to "investigation
period," if taken to mean the POI, does not foreclose the possibility that POSCO
benefitted from a non-recurring subsidy during the prior 15 years which should have
been allocated to the POI.  *See* Gov. Resp. at 39-40.

the loans.  POSCO Mot. at 40-44; POSCO Reply at 20-22.  The Government contends

that Commerce properly rejected DWI's corrections because the information

significantly altered the amount of reported lending and properly applied adverse facts

available because DWI "categorically withheld the information" regarding one type of

loan.  Gov. Resp. at 43-48; *see also* Pet'r Def.-Int. Resp. at 17-18.  Parties agree,

however, that this issue is mooted in the event the court affirms Commerce's use of

adverse facts available with regard to POSCO's affiliated input suppliers.  *See* Gov.

Resp. at 42; Oral Arg. at 2:05:53-2:06:05.  Because the court affirms Commerce's use

of adverse facts available with regard to POSCO's affiliated input suppliers, the court

need not and does not further address this issue.

### B.  Commerce's Use of the Highest Calculated Rates

#### 1.  Parties' Contentions

POSCO contends that Commerce applied the highest calculated subsidy rate

without evaluating the circumstances that led the agency to apply an adverse inference,

which it further contends did not merit the highest calculated rate.  POSCO Mot. at 22-

26; POSCO Reply at 12-14.

The Government contends that 19 U.S.C. § 1677e(d)(2)–(3) "codif[ied]

Commerce's practice of using an adverse facts available hierarchy in countervailing

duty cases when selecting adverse facts available rates for subsidy programs," and that

in "selecting the adverse facts available rates, Commerce was guided by its well-

established methodology."  Gov. Resp. at 49 (citations omitted).  The Government

further contends that the Federal Circuit has affirmed its practice, *id.* (citing *Essar Steel,*

*Ltd. v. United States* ("*Essar Steel II*"), 753 F.3d 1368, 1373-74 (Fed. Cir. 2014)), which "ensure[s] that Commerce applies a sufficiently adverse rate to ensure that a party does not achieve a better result by not cooperating than if it had cooperated fully." *id*. (citing SAA at 870). The Government also asserts that Commerce did not "automatically" apply the highest calculated rate, but rather based its rate selection on its discovery of unreported information at verification. *Id.* at 50 (citing I&D Mem. at 9-12); *see also* Pet'r Def.-Int. Resp. at 19-21 (arguing that the circumstances giving rise to Commerce's use of adverse facts available justifies the selected rates).

        In reply, POSCO asserts that the statute "tempers Commerce's ability to use the highest . . . rates" by requiring an evaluation of the underlying circumstances that resulted in the adverse inferences. POSCO Reply at 12 (citing 19 U.S.C. § 1677e(d)(2)). POSCO notes that the Federal Circuit decided *Essar Steel II* before § 1677e was amended to include subsection (d)(3) and did not directly address Commerce's adverse facts available methodology, but rather involved a challenge to Commerce's corroboration of the selected rates. *Id.* at 13 (citing *Essar Steel II*, 753 F.3d at 1371).

        **2. Analysis**

        In addressing its selection of adverse facts available rates, Commerce explained that it relied on its "practice" to select the highest calculated rates within its hierarchical methodology. *See* I&D Mem. at 12 & nn. 41-42.[42] The question is whether

_____

[42] Commerce cites several prior rulings in support of its practice. *See* I&D Mem. at 12 n. 41. These rulings predate the TPEA's addition of subsection (d)(2) to § 1677e.

Commerce's reliance on its practice constitutes a proper exercise of its discretion to select the highest rate pursuant to § 1677e(d)(2).  This appears to be an issue of first impression.  The court finds that Commerce's selection of the highest calculated rates lacked reasoned explanation required by statute and, therefore, is not supported by substantial evidence, nor in accordance with law.

In considering whether Commerce's determination is in accordance with law, the court's review of the agency's statutory interpretation is guided by the two-step framework provided in *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–45 (1984).  *See Apex Frozen Foods Private Ltd. v. United States*, 862 F.3d 1337, 1344 (Fed. Cir. 2017).  First, the court must determine "whether Congress has directly spoken to the precise question at issue."  *Id.* (quoting *Chevron*, 467 U.S. at 842).  If Congress's intent is clear, "that is the end of the matter," and the court "must give effect to the unambiguously expressed intent of Congress." *Id.* (quoting *Chevron*, 467 U.S. at 842–43). However, "if the statute is silent or ambiguous," the court must determine whether the agency's action "is based on a permissible construction of the statute."  *Id.* (quoting *Chevron*, 467 U.S. at 843).

In their written submissions, none of the parties address § 1677e(d)(2) under the *Chevron* framework.  The Government asserts that Commerce considered the circumstances that gave rise to the use of adverse facts available—and thereby complied with § 1677e(d)(2)—when it "thoroughly explained the multiple discoveries at verification of previously unreported information."  Gov. Resp. at 50 (citing I&D Mem. at 9-12); *see also* Pet'r Def.-Int. Resp. at 19-21.  In other words, according to the

Government, the evaluation contemplated by § 1677e(d)(2) is encompassed by

Commerce's decision to rely on adverse facts available, and no further analysis is

required.  At oral argument, the Government stated that, pursuant to a *Chevron* step

two analysis, Commerce reasonably exercised its discretion in selecting the highest

calculated rates based on its hierarchy.  The Government further argued that

Commerce's practice of using the highest rates is an exercise of the discretion afforded

by § 1677e(d)(2).  Oral Arg. at 1:26:30-1:28:17.  POSCO argued that the statute is

plain; thus, the inquiry ends at *Chevron* step one.  *Id.* at 1:29:20-1:29:33

        To be clear, the issue is not whether Commerce's hierarchical methodology as a

whole complies with the statute, but whether Commerce's unexplained selection of the

highest rates within each prong of its hierarchy complies with § 1677e(d)(2); the answer

is no.

        Section 1677e(d)(1) codifies Commerce's hierarchy for selecting a rate in an

adverse facts available situation.  Section 1677e(d)(2) both elaborates that the

application of the hierarchy provides Commerce with the discretion to apply the highest

countervailing duty rate, and limits Commerce's exercise of that discretion.  Congress

has directed Commerce to base its selection of the subsidy rate—highest or not—on an

"evaluation . . . of *the situation* that resulted in the [agency] using an adverse inference."

19 U.S.C. § 1677e(d)(2) (emphasis added).  Thus, the statute contemplates a case-

specific evaluation as part of Commerce's selection from among a range of rates.

Moreover, because the requirement for this evaluation was added to the pre-existing

statutory requirements for using adverse facts available, clearly some additional

evaluation is required beyond that which justified the adverse inference.  Otherwise,

Congress could simply have stated that Commerce "may apply any of the

countervailable subsidy rates or dumping margins specified under that paragraph,

including the highest such rate or margin," and omitted the remaining text.  *See id.*

§ 1677e(d)(2).[43]  Again, something more—i.e., an evaluation of the specific situation—is

required.  And, at a minimum, Commerce must apprise the court of the basis for its

findings in this regard.  *See NMB Singapore*, 557 F.3d at 1319.  Here, Commerce failed

to fulfill its statutory duty because it failed to explain why this case justified its selection

of the highest rates.  *See* I&D Mem. at 12.

        The Government's attempt to rely on the factual circumstances meriting the

application of adverse facts available as evidence of Commerce's evaluation pursuant

to § 1677ed)(2) is unavailing.  That the facts merited the use of an adverse inference

does not necessarily mean that those same facts merited selection of the highest rate.

Moreover, the court may not weigh the evidence justifying a particular decision in the

first instance; that is Commerce's province.  *See Bowman Transp., Inc. v. Ark.-Best

Freight System, Inc.*, 419 U.S. 281, 285–86 (1974) ("The agency must articulate a

rational connection between the facts found and the choice made.") (internal quotation

marks and citation omitted).

---

[43] It is well settled "that a statute must, if possible, be construed in such a fashion that
every word has some operative effect." *United States v. Nordic Village Inc.*, 503 U.S.
30, 36 (1992); *see also China Diesel Imports, Inc. v. United States*, 18 CIT 1086, 1090,
870 F. Supp. 347, 351 (1994) ("Courts are required to give effect to each word of a
statute, whenever possible.").

Likewise, the court is not persuaded by the Government's argument that Commerce's practice properly "ensure[s] that Commerce applies a *sufficiently adverse* rate to ensure that a party does not achieve a better rate by not cooperating than if it had cooperated fully." Gov. Resp. at 49 (citing SAA at 870) (emphasis added). Although the SAA permits Commerce to "employ adverse inferences . . . to ensure that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully," SAA at 870, the SAA does not state or suggest that only the highest rates will achieve that goal. Moreover, Commerce never explained why the highest rate was the only rate "sufficiently adverse" for POSCO not to benefit from its lack of cooperation.

In sum, § 1677e(d)(2) contemplates the selection of the highest rate when the situation merits the highest rate. *See* 19 U.S.C. § 1677e(d)(2). Commerce failed to evaluate whether the circumstances in this case merited the highest rate. Accordingly, its determination is remanded for reconsideration and further explanation.

## C. Corroboration of the Selected Rates[44]

### 1. Parties' Contentions

POSCO contends that Commerce's discussion of the corroboration requirement in the Issues and Decision Memorandum reflects a misinterpretation of its statutory

---

[44] The court is mindful that Commerce may, pursuant to the remand ordered in Section I.B, select different rates on the basis of its evaluation of the situation that resulted in the use of an adverse inference. However, in the event that Commerce retains the current rates, for efficiency purposes, the court will address Parties' arguments regarding the corroboration of those rates.

obligation.  POSCO Mot. at 27-30.  POSCO further contends that, to the extent that

Commerce's discussion of its corroboration of the 1.64 percent rate from *Refrigerators*

*from Korea* in the Ministerial Error Memorandum supersedes the Issues and Decision

Memorandum, "POSCO's statutory argument remains as to the 1.05 percent rate"

obtained from *Washers from Korea*.  *Id*. at 31; POSCO Reply at 15-16.  POSCO

asserts, however, that Commerce's failure to corroborate the 1.05 percent rate renders

the agency's reliance on that rate unsupported by substantial evidence, and

"Commerce's attempt to corroborate the 1.64 percent rate is not supported by

substantial evidence."  POSCO Mot. at 31; *see also id*. at 31-36; POSCO Reply at 16.

　　　The Government contends that Commerce's inability to corroborate the selected

rates using independent data on company-specific benefits means that Commerce

corroborated the rates "to the extent practicable."  Gov. Resp. at 50-51; *see also* Pet'r

Def.-Int. Resp. at 21 (concurring with the Government).  According to the Government,

because Commerce selected the rates pursuant to its established hierarchy, they are

"properly corroborated under the statute."  Gov. Resp. at 51 (citations omitted); *see also*

*id.* at 52-54 (discussing the reliability and relevance of the selected rates).

　　　POSCO responds that Commerce's reliance on its hierarchy to select rates does

not obviate the corroboration requirement.  POSCO Reply at 14-15 (citing *Tai Shan City*

*Kam Kiu Aluminium Extrusion Co. Ltd. v. United States*, 39 CIT ___, ___, 58 F. Supp.

3d 1384, 1395 (2015)).

### 2. Analysis

"Corroborat[ion] means that the [agency] will examine whether the secondary information to be used has probative value." 19 C.F.R. § 351.308(d). "Commerce demonstrates probative value by 'demonstrating [that] the rate is both reliable and relevant.'" *Özdemir,* 2017 WL 4651903, at *16 (quoting *Ad Hoc Shrimp Trade Action Comm. v. United States*, 802 F.3d 1339, 1354 (Fed. Cir. 2015)).  Taken together, the Issues and Decision Memorandum and Ministerial Error Memorandum adequately apprise the court of Commerce's method of corroborating the selected rates, which the court finds is entitled to deference.  *See* I&D Mem. at 15; Ministerial Error Mem. at 4. However, Commerce's corroboration of the 1.64 percent rate is unsupported by substantial evidence.

### a. Corroboration Methodology

POSCO identifies the following language in the Issues and Decision Memorandum as evidence of Commerce's misinterpretation of its statutory obligation to corroborate secondary information:

> However[,] [19 U.S.C. § 1677e](c)(1) does not require corroboration when the information relied upon for adverse inferences is derived from the petition, a final determination in the investigation, any previous review under section 751 of the Act or determination under section 753 of the Act, or any other information placed on the record.
> . . .
>
> Additionally, as stated above, we are applying subsidy rates, which were calculated in this investigation or previous Korea CVD investigations or administrative reviews. *Therefore, the corroboration exercise of section 776(c)(1) of the Act is inapplicable for purposes of this investigation.*

POSCO Mot. at 28 (quoting I&D Mem. at 15).  POSCO has, however, omitted two key

sentences from Commerce's explanation.

First, immediately before the first sentence of the first paragraph quoted above,

Commerce explains that § 1677e(c)(1) "provides that, when the [agency] relies on

secondary information rather than on information obtained in the course of an

investigation or review, *it shall, to the extent practicable, corroborate that information*

*from independent sources that are reasonably at its disposal.*"  I&D Mem. at 15

(emphasis added).  Additionally, immediately before the first sentence of the second

paragraph quoted above, Commerce explains that, "[w]ith regard to the reliability aspect

of corroboration, unlike other types of information, such as publicly available data on the

national inflation rate of a given country or national average interest rates, there typically

are no independent sources for data on company-specific benefits resulting from

countervailable subsidy programs."  *Id*.  Accordingly, although Commerce could have

been clearer, the agency is plainly cognizant of its statutory obligation to corroborate

secondary information "to the extent practicable."  Moreover, Commerce's reference to

the "inapplicab[ility]" of corroboration is reasonably understood to refer to the "typical[]"

lack of independent sources of data on company-specific benefits for Commerce to use

to measure the reliability of the selected rates.  In other words, the lack of benefits-

related data means that Commerce is limited in its ability to corroborate the selected

rates pursuant to 19 U.S.C. § 1677e(c)(1) "from independent sources that are

reasonably at their disposal."

This understanding of Commerce's explanation is supported by the Ministerial Error Memorandum.  Therein, Commerce explains that its ability to "use a countervailable subsidy rate applied for a similar program in a [CVD] proceeding involving the same country . . . is significant[] because . . . with regard to the reliability aspect of corroboration, . . . there typically are no independent sources for data on company-specific benefits resulting from countervailable subsidy programs."   Ministerial Error Mem. at 4.  Under those circumstances, Commerce implements its duty to corroborate "to the extent practicable" by selecting "[a]ctual rates calculated based on actual usage by Korean companies" that were "calculated in the context of an administrative proceeding."  *Id*.  As to relevance, Commerce "strive[s] to assign AFA rates that are the same in terms of type of benefit . . . because these rates are relevant to the respondent."  *Id.*  To that end, Commerce first identifies rates associated with the identical subsidy program in the investigation or a CVD proceeding involving the same country; if such rates are unavailable, Commerce identifies rates associated with a similar program in a CVD proceeding involving the same country; or, finally, absent rates from a similar program, Commerce will use a rate associated with a program identified in a CVD proceeding from the same country "that could conceivably be used by the non-cooperating [respondent]."  I&D Mem. at 12.  Commerce's hierarchy, which it relied on here, *see* I&D Mem. at 12-15; Ministerial Error Mem. at 4, thus prioritizes the

selection of rates from identical programs that would confer the same type of benefit,

while accounting for situations when such rates are unavailable.[45]

POSCO asserts that Commerce's reliance on its hierarchy to corroborate the

selected rates permits the imposition of "punitive rates that 'render the corroboration

requirement . . . meaningless.'"  POSCO Mot. at 34 (quoting Ministerial Error Mem. at 4;

*De Cecco*, 216 F.3d at 1034) (alteration omitted)).  The *De Cecco* court, however, did

not speak to the instant issue.[46]  Moreover, Commerce relies on an examination of the

reliability and relevance of the selected rates in the absence of independent sources of

data on company-specific benefits.  *See* I&D Mem. at 15.  Commerce is entitled to

deference in its selection of methodologies to implement its statutory mandates.  *See,*

*e.g.*, *Apex Frozen Foods*, 862 F.3d at 1351 (citation omitted).  POSCO does not

persuade the court that Commerce's method of assessing the reliability and relevance

of the selected rates is an impermissible interpretation of its statutory duty to

corroborate the rates "to the extent practicable."  *Cf. Özdemir*, 2017 WL 4651903, at *16

(affirming Commerce's corroboration of the selected adverse facts available rates when

---

[45] At oral argument, the Government explained that Commerce corroborated the 1.05 percent rate "to the extent practicable."  Oral Arg. at 1:35:35-1:36-35 (reiterating that when independent data is unavailable for purposes of corroboration, Commerce ensures reliability and relevance by selecting rates in accordance with its hierarchy).
[46] Rather, the court opined that the imposition of an adverse dumping margin that was higher than any margin assigned to other producers would have "render[ed] the corroboration requirement of section 1677e(c) meaningless."  *De Cecco*, 216 F.3d at 1034.

its assessment of the reliability and relevance of those rates was supported by

substantial evidence).[47]

---

[47] POSCO also appears to contend that Commerce must corroborate the aggregate subsidy rate in addition to corroborating the individual rates.  *See* POSCO Mot. at 35 (asserting that the aggregate rate is considerably less than its affiliates' total sales values); *id.* at 36 (asserting that the rates are not reliable or relevant because they result in a CVD rate that is three times greater than even a punitive rate that can be calculated using record information) (citing *Gallant Ocean (Thailand) Co., Ltd. v. United States,* 602 F.3d 1319, 1323 (Fed. Cir. 2010) for the proposition that corroboration ensures that the rate applied is remedial and not punitive; POSCO Reply at 15 (citing *Tai Shan*, 58 F. Supp. 3d at 1395).  Although the *Tai Shan* court remanded Commerce's determination for failure to corroborate the respondent's aggregate adverse facts available rate, it relied, at least in part, on Federal Circuit case law requiring Commerce to select a rate that reflects the respondent's commercial reality.  *See Tai Shan*, 58 F. Supp. 3d at 1392 (citing, *inter alia, Gallant Ocean*, 602 F.3d at 1323); *Tai Shan City Kam Kiu Aluminium Extrusion Co. Ltd. v. United States*, 39 CIT ___, ___, 125 F. Supp. 3d 1337, 1344, 1346 (2015) (opinion after remand) (squarely placing the relevance aspect of the corroboration requirement within *Gallant Ocean*'s "commercial reality" framework); *Gallant Ocean*, 602 F.3d at 1323-24 (holding that Commerce must calculate a subsidy rate that reflects "commercial reality").  However, that commercial reality requirement has since been superseded by statute.  *See* 19 U.S.C. § 1677e(d)(3)(B)(2015) (Commerce is *not* required "to demonstrate that the countervailable subsidy rate . . . reflects an alleged commercial reality of the interested party").  Additionally, the statute does not require Commerce to estimate what the subsidy rate would have been had POSCO fully cooperated.  *See id.* § 1677e(d)(3)(A).  During oral argument, POSCO acknowledged that there is no statutory basis for requiring Commerce to corroborate the aggregate rate.  Oral Arg. at 1:51:40-1:53:36.  Instead, POSCO relied on the general purpose of corroboration as a check on Commerce's ability to impose punitive rates and its obligation to calculate accurate margins.  *Id.* at 1:47:29-1:48:42.  However, the statute's corroboration requirement is program-specific.  *See* 19 U.S.C. § 1677e(c) (Commerce must corroborate secondary information (i.e., the rates selected from programs external to the instant investigation or review)).  Additionally, although POSCO characterizes the final subsidy rate as punitive, *see* POSCO Mot. at 36, it has not presented any substantive arguments challenging Commerce's determination regarding the countervailable programs POSCO benefitted from, *see* I&D Mem. at 18-37 (analysis of programs).  *Cf. Tai Shan*, 58 F. Supp. 3d at 1392 (explaining that the respondent challenged Commerce's assignment of rates from location-specific subsidy programs spanning the entirety of the People's Republic of China).  Accordingly, POSCO's argument is unavailing.

### b.  Reliability and Relevance

POSCO contends that the 1.64 percent rate is unreliable because it was calculated using an adverse inference that allowed Commerce to build estimates into its rate determination.  POSCO Mot. at 33-34; POSCO Reply at 16.  The Government contends that "the 1.64 percent rate is not . . . *wholly derived* from [AFA]," but from estimations made using the respondent's reported data.  Gov. Resp. at 53 (emphasis added).  At oral argument, the Government sought to persuade the court that Commerce's reliance on the respondent's data means that the rate was sufficiently calculated for corroboration purposes.  Oral Arg. at 1:39:40-1:41:58.  The court disagrees.

In *Refrigerators from Korea*, Commerce explained that because the respondent failed to provide documentation demonstrating that its claim for benefits under the countervailable K-SURE Short-Term Export Insurance program did not cover subject merchandise, Commerce made the adverse inference "that the claim applied only to subject merchandise."  *Refrigerators from Korea*, I&D Mem. at 16.  Based on that adverse inference, Commerce then estimated the insurance premiums the respondent would have paid on the subject merchandise.  *Id.*  Next, to determine the benefit, Commerce compared its estimated premium to the payout the respondent received on its K-SURE claim during the POI.  *Id.*  Commerce arrived at the 1.64 percent rate by dividing the amount by which the payout exceeded the estimated premiums by the respondent's exports of subject merchandise to the United States.  *See id.*  Thus, the 1.64 percent rate is derived from estimates Commerce made on the basis of an adverse

inference.  *See id.*  The rate is not as Commerce asserted, an "[a]ctual rate[] calculated based on *actual usage*" of a countervailable program by a Korean company. *See* Ministerial Error Mem. at 4 (emphasis added).  Accordingly, Commerce's selection of this rate is unsupported by substantial evidence, and is remanded for reconsideration.

As to the 1.05 percent rate, Commerce's corroboration of that rate is discernible from the Ministerial Error Memorandum.  *See NMB Singapore*, 557 F.3d at 1319. Therein, Commerce clarified that its "selection of the 1.64 percent rate is consistent with the methodology used to select the AFA rates [(i.e., including the 1.05 percent rate)] discussed in [the] *Final Determination*."  Ministerial Error Mem. at 4 & n. 21 (citing, *inter alia*, I&D Mem. at 15).  Thus, the reliability of the 1.05 percent rate turns on whether it is an actual rate calculated based on a Korean company's actual usage of a countervailable program.  *See id.*  The pertinent ruling demonstrates that it is, and POSCO has not presented any contrary argument.  *See Washers from Korea*, I&D Mem. at 14–15 (explaining that Commerce calculated the countervailable subsidy by dividing the respondent's POI sales by the amount of tax credits it received pursuant to the program).  The relevance of the 1.05 percent rate is validated based on Commerce's selection of it pursuant to its hierarchy.  *See* I&D Mem. at 12-15. Accordingly, Commerce's corroboration and selection of the 1.05 percent rate is supported by substantial evidence.

In sum, the court grants in part POSCO's motion with respect to Commerce's unexplained use of the highest calculated rates to determine POSCO's adverse facts available rate and Commerce's selection of the 1.64 percent rate for certain programs.

## II.   Nucor's Rule 56.2 Motion for Judgment upon the Agency Record

### A. Commerce's Determination that the Provision of Electricity was not for Less than Adequate Remuneration

#### 1.  Parties' Contentions

Nucor contends that Commerce's determination that the provision of electricity was not for less than adequate remuneration is unlawful because Commerce (1) impermissibly examined preferentiality through its standard pricing mechanism analysis; (2) unreasonably interpreted "adequate remuneration" in a manner that excluded cost-recovery; and (3) ignored arguments and evidence demonstrating that Korean electricity price-setting does not comport with market principles.  Nucor Mot. at 14-31; Nucor Reply at 2-12.[48]  Nucor also contends that Commerce's determination lacks substantial evidence.  Nucor Mot. at 30-31; Nucor Reply at 12-20.

The Government contends that Commerce's analysis of KEPCO's standard pricing mechanism "is consistent with the statutory requirement that 'the adequacy of remuneration shall be determined in relation to prevailing market conditions.'"[49]  Gov.

---

[48] Nucor asserts that "Commerce unlawfully determined that the provision of electricity for less than adequate remuneration does not confer a benefit."  Nucor Mot. at 14. Such a finding would be contrary to the statute, which states that the provision of a good or service for less than adequate remuneration *does* confer a benefit.  *See* 19 U.S.C. § 1677(5)(E)(iv).  However, Commerce found no benefit on the basis of its finding that there *was no* provision of electricity for less than adequate remuneration.  *See* I&D Mem. at 45.

[49] The Government construes Nucor's arguments as advocating for the court to hold unlawful Commerce's regulation promulgating the three-tiered analysis.  Gov. Resp. at 17.  Nucor disagrees, arguing that "Commerce's application of its [three tier] regulation *in this case* was inconsistent with the statute because it relied on a preferentiality standard drawn from a pre-URAA investigation."  Nucor Reply at 7.

Resp. at 10, 16 (citing 19 U.S.C. § 1677(5)(E)).  The Government asserts that although

the statutory and corresponding regulatory changes effected by the URAA deemphasize

preferentiality, price discrimination may still be relevant in a so-called Tier-3 analysis.

*Id.* at 18.  The Government further contends that Commerce adequately addressed

KEPCO's cost of purchasing electricity from the KPX.  *Id*. at 15.

     Respondent Defendant-Intervenors dispute Nucor's contention that Commerce

conflated a standard pricing mechanism analysis with preferentiality.  Resp't Def.-Int.

Resp. at 13.  Respondent Defendant-Intervenors further contend that the statutory

change from "preferential" to "adequate remuneration" was not intended to discard

altogether the concept of preferentiality, but to implement changes in the 1994 WTO

Agreement on Subsidies and Countervailing Measures that defined a countervailable

subsidy on the basis of financial contribution, benefit, and specificity.  *Id*. at 14 & n.4

(citing, *inter alia*, SAA at 927).  Respondent Defendant-Intervenors also contend that

Nucor's argument about market distortion is "flawed and is based on a patchwork of

factual information that is woven together to try and create an issue where none exists."

*Id*. at 21-22; *id.* at 22-26 (addressing Nucor's evidence).

## 2.  Analysis

### a.  The Standard Pricing Mechanism

     Nucor argues that Commerce used a standard pricing mechanism analysis to

measure preferentiality and, thus, failed to measure adequate remuneration in the post-

URAA legal landscape.  Nucor Mot. at 15, 16-20; Nucor Reply at 7.  The statute directs

Commerce to determine "the adequacy of remuneration . . . in relation to prevailing

market conditions for the good or service being provided or the goods being purchased

in the country which is subject to the investigation or review."  19 U.S.C.

§ 1677(5)(E)(iv).  Absent domestic market-based prices or a world market price,

Commerce measures the adequacy of remuneration by determining "whether the

government price is consistent with market principles."  I&D Mem. at 45 (quoting 19

C.F.R. § 351.511(a)(2)(iii)).  That determination is based on an examination of certain

non-hierarchical disjunctive factors: "the government's price-setting philosophy [i.e.

standard pricing mechanism], cost, *or* possible price discrimination."  *Id*. at 45 & n.212

(citing *CVD Preamble*, 63 Fed. Reg. at 65,378) (emphasis added).  Consistent with the

analysis set forth in *Magnesium from Canada*, Commerce considered whether the rate

charged to the respondents complied with the standard pricing mechanism, and

whether the companies were afforded any preferential treatment.  *Id.* at 45-46.

        The statutory meaning of "adequate remuneration" is ambiguous, and the statute

does not state a particular method Commerce must use to determine the adequacy of

remuneration.  In two recent opinions, however, this court has affirmed Commerce's

consideration of KEPCO's standard pricing mechanism to measure the adequacy of

remuneration as a permissible interpretation of the statute.  *See Maverick Tube*, 273 F.

Supp. 3d at 1308;[50] *Nucor Corp. v. United States*, Slip Op. 18-7, 2018 WL 895714, at *5

_____

[50] *Maverick Tube* concerned Commerce's final negative determination in a CVD
investigation of Korean welded line pipe.  273 F. Supp. 3d at 1296.  Parties filed
supplemental briefs on whether this court should follow *Maverick Tube.  See* Def.-Ints.'
Notice of Recent Op., ECF No. 85; Pl. Nucor and Pl.-Ints. AK Steel Corp., ArcelorMittal
USA LLC, and United States Steel Corp.'s Resp. to Notice of Suppl. Authority ("Nucor
Suppl. Br."), ECF No. 90; Def.'s Reply to Pet'rs' Resp. to Def.-Int.'s Notice of Recent

(CIT Feb. 6, 2018).[51]  For the following reasons, the court agrees with and adopts the

analyses articulated by the *Maverick Tube* and *Nucor* courts.

        Commerce's tier-based approach to determining adequate remuneration

"accomplishes the post–URAA preference for market-based prices."  *Maverick Tube*,

273 F. Supp. 3d at 1309; *see also Nucor*, 2018 WL 895714, at *6 ("The statute sets a

standard of adequate remuneration, . . . and the regulation explicates that standard in a

variety of contexts.") (citations omitted).  Commerce promulgated § 351.511 after

"acquir[ing] some experience with the new statutory provision," *CVD Preamble*, 63 Fed.

Reg. at 65,377, and, relevant here, grappling with how best to apply the adequate

remuneration standard in the context of government monopolies, *see Maverick Tube*,

273 F. Supp. 3d at 1298 (collecting Commerce rulings discussing the issue).  The

resulting regulation emphasizes domestic and world market prices (Tier 1 and 2

analyses) while permitting consideration of other factors, such as price-setting and price

discrimination (in a Tier 3 analysis), when market-based prices are unavailable.  *See* 19

C.F.R. § 351.511; *Maverick Tube*, 273 F. Supp. 3d at 1307 (examining preferentiality in

conjunction with a standard pricing mechanism may be "relevant to determine the

adequacy of remuneration when market-based prices are unavailable");[52] *Nucor*, 2018

---

Court Op., ECF No. 91; Def.-Ints' Reply to Pl.'s Resp. to Def.'s Notice of Recent Court
Op., ECF No. 92.

[51] *Nucor* concerned Commerce's final affirmative determination in a CVD investigation
of Korean corrosion-resistant steel products.  2018 WL 895714, at *1.

[52] Nucor asserts that the *Maverick Tube* court allowed Commerce to "take[] the market
as it finds it, even if it is, for all practical purposes, a monopoly."  Nucor Suppl. Br. at 6-7
(quoting *Maverick Tube*, 273 F. Supp. 3d at 1308).  Contrary to Nucor's suggestion, the
*Maverick Tube* court did not "blindly accept[]" the Korean government's price for

WL 895714, at *7 (Commerce's Tier 3 "analysis preserves a place for the preferentiality

test" when market-based prices are unavailable).  Nucor's assertion that Commerce's

reliance on a standard pricing mechanism analysis is unlawful post-URAA lacks merit

because it ignores the entirety of Commerce's regulatory changes and Commerce's

separate consideration of price-setting and preferentiality. *See* I&D Mem. at 46.

Nucor also argues that Commerce failed to assess whether the standard pricing

mechanism supplied a suitable benchmark.  Nucor Mot. at 20; Nucor Reply at 8

(asserting Commerce should first have determined whether the government price is "the

*most reasonable* surrogate for market-determined prices") (citing *CVD Preamble*, 63

Fed. Reg. at 65,378).  When, as here, the prevailing market for electricity is a

government monopoly, the *CVD Preamble* recognizes that the government price may

be "the most reasonable surrogate for [a] market-determined price[]."  63 Fed. Reg. at

65,378; *see also* Prelim. Mem. at 30; GOK QR at 4.  Commerce's examination of a

standard pricing mechanism "as a proxy for conformity with market principles"

supported the conclusion that the government price provided a suitable benchmark.

*Nucor*, 2018 WL 895714, at *7.  Commerce "assessed whether the prices charged by

KEPCO are set in accordance with market principles through an analysis of KEPCO's

_____

electricity as "adequate remuneration"; rather, that court considered Commerce's
examination of KEPCO's rate setting and rate development on the basis of "annual cost
data as calculated by an independent accounting firm."  *Maverick Tube*, 273 F. Supp.
3d at 1308.  Although those factors derive from the "commercial and market practices
and conditions for the provision of electricity" as they exist in Korea, *id.* (citation
omitted), the court did not suggest that Commerce may never rely on a third-country
price in a Tier 3 analysis, or otherwise.  The court simply affirmed Commerce's decision
not to do so on the factual record before it.  *See id.*

price-setting method."  I&D Mem. at 45.  Commerce explained that POSCO and

Hyundai Steel purchased electricity through KEPCO in accordance with the tariff rate

that applied throughout the POI and were treated no differently from other industrial

consumers that purchased similar amounts of electricity.  *Id*. at 46.

    Nucor insists, however, that Commerce must analyze KEPCO's standard pricing

mechanism for distortive government intervention.  Nucor Mot. at 21.[53]  According to

---

[53] Pointing to several Tier 3 cases where Commerce used external prices as a
benchmark for adequate remuneration, Nucor urges the court to remand the instant
matter for Commerce to clarify when government distortion is irrelevant.  Nucor Suppl.
Br. at 10-13 (discussing *Certain Cold-Rolled Steel Flat Products from the Russian
Federation*, 81 Fed. Reg. 49,935 (Dep't Commerce July 29, 2016) (final aff.
countervailing duty determination and final neg. critical circumstances determination;
2014), and accompanying Issues and Decision Mem., C-821-823 (July 20, 2016) ("*CRS
from Russia*, I&D Mem.") at 52-56, 69-70; *Certain Uncoated Paper from Indonesia*, 81
Fed. Reg. 3104 (Dep't Commerce Jan. 20, 2016) (final aff. countervailing duty
determination; 2014), and accompanying Issues and Decision Mem., C-560-829 (Jan.
8, 2016) ("*Paper from Indonesia*, I&D Mem.") at 13-17; *Laminated Woven Sacks from
the People's Republic of China*, 73 Fed. Reg. 35,639 (Dep't Commerce June 24, 2008)
(final aff. countervailing duty determination and final aff. determination, in part, of critical
circumstances), and accompanying Issues and Decision Mem., C-570-917 (June 16,
2008) ("*Woven Sacks from China*, I&D Mem.") at 58).  Nucor's request is, in part,
prospective because it seeks "methodological clarity" as to how Commerce will conduct
its Tier 3 analysis in future cases.  *See* Nucor Suppl. Br. at 15-16.  However, the court's
post-remand review of any such clarification would amount to an impermissible advisory
opinion because the court would be opining on matters outside the scope of the instant
case and controversy.  *See* Gov. Suppl. Br. at 2-3; Def.-Ints. Nucor Suppl. Br. at 4-5;
*United States v. Fruehauf*, 365 U.S. 146, 157 (1961); *Verson, A Division of Allied Prods.
Corp. v. United States*, 22 CIT 151, 153, 5 F. Supp. 2d 963, 966 (1998) ("[A] federal
court does not have the power to render an advisory opinion on a question simply
because [it] may have to face the same question in the future.") (internal quotation
marks and citations omitted).  Moreover, the agency rulings cited by Nucor are
distinguishable because in those cases Commerce determined that the government
price was inconsistent with market principles and, thus, an unsuitable benchmark.  *See
CRS from Russia*, I&D Mem 67-69 (finding that Gazprom, a gas company in which the
Russian Federation owns a controlling stake, sold gas at artificially low prices); *Paper
from Indonesia*, I&D Mem.at 15-16 (finding that a ban on the export of logs affected the

Nucor, "Commerce failed to reasonably explain how KEPCO's so-called standard

pricing for large industrial users of electricity resulted in prices that were market-based."

*Id*.  But the statute does not obligate Commerce to apply such a test; nowhere does it

use the phrase "market-based."  *See* 19 U.S.C. § 1677(5)(E)(iv) (directing Commerce to

determine the adequacy of remuneration "in relation to prevailing market conditions").

Although Commerce's regulatory hierarchy emphasizes domestic or world market

prices, when those prices are unavailable, Commerce assesses "consisten[cy] with

market principles," not the existence of a supply-and-demand type market.  19 C.F.R.

§ 351.511(a)(2).  "[T]he very existence of the [Tier 3] benchmark analysis supports the

view that the relevant market principles" are examined in the context of "those operating

within the government-controlled market."  *Nucor*, 2018 WL 895714, at *6.  In sum,

Commerce's methodology is based on a permissible interpretation of the statute.

### b.  Commerce's Interpretation of Adequate Remuneration

Nucor contends that cost recovery is the *sine qua non* of adequate remuneration,

and Commerce's failure to consider evidence that KEPCO sold electricity at below cost

renders its interpretation of adequate remuneration unreasonable.  Nucor Mot. at 22-23.

Both the *Maverick Tube* and *Nucor* courts have rejected Nucor's argument, and this

---

domestic reference price used as the basis for stumpage fees); *Woven Sacks from China*, I&D Mem. at 15-16 (finding that local government corruption and deviation from land use laws and regulations rendered the purchase of land-use rights discordant with market principles).  In contrast, here, Commerce determined that the government price did accord with market principles.  *See* I&D Mem. at 46.  Accordingly, the court's affirmance of Commerce's decision in this case, as in *Maverick Tube* and *Nucor*, does not mean that Commerce may not rely on an external price when it determines that the particular case merits an external benchmark.

court agrees.  *See Maverick Tube*, 273 F. Supp. 3d at 1310; *Nucor*, 2018 WL 895714,

at *8.

> The *CVD Preamble* contemplates the consideration of costs as one possible

factor in Commerce's determination whether a government price is consistent with

market principles pursuant to a Tier 3 analysis; however, it is not required.  63 Fed.

Reg. at 65,378.  Even in a free-market economy, cost recovery is not always a defining

feature.  *See Maverick Tube*, 273 F. Supp. 3d at 1310 ("[I]t is elemental that the

functioning of a free market guided by the law of supply and demand sometimes results

in sales below cost.").  Further, Commerce did consider KEPCO's costs, finding that

KEPCO's standard pricing mechanism was based upon its costs and enabled it to cover

them.  *See* I&D Mem. at 50;[54] *see also* GOK QR at 20-21 (detailing KEPCO's cost

calculation). Commerce's definition of adequate remuneration by way of reference to its

---

[54] Commerce explained that

> [t]o develop the electricity tariff schedules that were applicable during the
> POI, KEPCO first calculated its overall cost, including an amount for
> investment return. This cost includes the operational cost for generating
> and supplying electricity to the consumers as well as taxes. The cost for
> each electricity classification was calculated by (1) distributing the overall
> cost according to the stages of providing electricity (generation,
> transmission, distribution, and sales); (2) dividing each cost into fixed cost,
> variable cost, and the consumer management fee; and (3) then calculating
> the cost by applying the electricity load level, peak level, and the patterns
> of consuming electricity. Each cost was then distributed into the fixed
> charge and the variable charge. KEPCO then divided each cost taking into
> consideration the electricity load level, the usage pattern of electricity, and
> the volume of the electricity consumed. Costs were then distributed
> according to the number of consumers for each classification of electricity.

I&D Mem. at 50; *see also* GOK QR at 20-21 (containing a diagrammatical breakdown of
the cost calculation).

regulatory hierarchy and concomitant Tier 3 factors is, therefore, reasonable.  *See* 19

C.F.R. § 351.511; *CVD Preamble*, 63 Fed. Reg. at 65,378.

### c.  Consideration of the KPX

Nucor argues that the KPX's method of calculating its electricity prices distorts

KEPCO's prices because it undercompensates electricity generators, such as nuclear

generators, which have high fixed costs and low variable costs.[55]  Nucor Mot. at 25-26.

According to Nucor, this introduces a subsidy because large industrial users can fashion

their electricity consumption to take advantage of electricity produced by cheaper

nuclear generators.  *Id.* at 26 (citing GOK Suppl. QR at 7 n.3).

Commerce explained that the record does not show "that utility companies have

separate tariff rates that are differentiated based upon the manner in which the

electricity is generated," or that the costs KEPCO used to develop its tariff schedule did

not reflect the actual costs of the electricity it transmits and distributes.  I&D Mem. at 50.

Commerce did not request information regarding the costs of electricity generation

> because the costs of electricity to KEPCO are determined by the KPX.
> Electricity generators sell electricity to the KPX, and KEPCO purchases
> the electricity it distributes to its customers through the KPX. Thus, the
> costs for electricity are based upon the purchase price of electricity from
> the KPX, and this is the cost that is relevant for KEPCO's industrial tariff
> schedule.

---

[55] KPX prices are based on a "marginal price" plus "capacity price" formulation.  Nucor
Mot. at 25 (citing GOK QR at 24, 26-27, Ex. E-3 at 33).  The "marginal price" is the
variable cost of producing electricity, which consists primarily of fuel costs.  GOK QR,
Ex. E-3 at 31.  The "capacity price" represents the fixed costs of producing electricity,
such as constructing facilities to generate electricity.  *Id.*, Ex. E-3 at 33.  "The capacity
price is determined annually by the Cost Evaluation Committee based on the
construction costs and maintenance costs of a standard generation unit . . . ."  *Id.*  The
capacity price "is applied equally to all generation units, regardless of fuel types used."
*Id.*

*Id*.

Nucor seeks to undermine Commerce's determination by pointing to the GOK's explanation for the cheaper electricity prices applicable to industrial users.  Nucor Mot. at 27 (citing GOK Suppl. QR at 7 n.3).[56]  The GOK explained, however, that the cost of supplying electricity to the *top 100 consumers* is less than the *average cost* of supplying industrial electricity because the top consumers "have relatively steady electricity demands" that enables lower fixed costs or they can consume electricity when demand is low (e.g., at night).  GOK Suppl. QR at 6-7 & n.3.  Although the price paid by the top 100 consumers may, therefore, be lower than the average paid by all industrial users, the GOK's statement does not suggest that the industrial tariff applicable to all users is distorted.  Nucor also relies on Hyundai Steel's assertion that nuclear generators cover

---

[56] KEPCO had been asked to provide a report to the Korean National Assembly's Trade, Industry & Energy Committee on its "assistance to top 100 industrial electricity consumers through the supply of electricity from 2003 through 2012."  GOK Suppl. QR at 6.  To accurately respond, KEPCO "would have had to calculate the differences between the amount of the fees charged to those companies and the actual cost for supplying electricity to them for every year from 2003 through 2012."  *Id*.  Because KEPCO lacked data on its cost of supplying electricity to the top 100 industrial consumers, a National Assembly member asked KEPCO to instead use "the average cost for supplying industrial electricity" in its calculations.  *Id*. at 6-7.  In its questionnaire response, the GOK sought to explain why KEPCO's adherence to the member's request—that is, calculating the difference between the price paid by the top 100 consumers and the average cost of supplying industrial electricity *in toto*—produced defective data.  *Id*. at 7 & n.3.  The GOK explained that electricity costs differ depending, in part, on when electricity is consumed and the pattern of consumption.  *Id*. Many of the top 100 industrial consumers of electricity "have relatively steady electricity consumption that allows the fixed costs of generation to be kept relatively low," or if they "do not have relatively steady electricity demands," they "attempt to schedule operations to maximize . . . the use of electricity when the overall load is low," such as at night.  *Id*. For those reasons, the cost of "supplying electricity to the top 100 industrial consumers is relatively low compared to the average cost [of] supplying industrial electricity."  *Id*.

their fixed and variable costs because they receive the same compensation as the highest variable cost generators.  Nucor Mot. at 26-27 (citing Hyundai Steel's Rebuttal Br. (May 25, 2016) ("Hyundai Steel Rebuttal Br.") at 15,[57] CJA Tab 36, CR 464, PJA Tab 36, PR 426, ECF No. 79).  However, Hyundai Steel sought to explain that nuclear generators cover their costs because they generate a higher return on the marginal price, thereby refuting Nucor's argument that nuclear generators fail to cover their costs "because of an artificially low capacity price component."  Hyundai Steel Rebuttal Br. at 32.  Hyundai Steel did not, as Nucor contends, state that nuclear generators receive the same total amount as other generators to cover fixed and variable costs.  *See* Nucor Mot. at 26-27, 28; Hyundai Steel Rebuttal Br. at 32; GOK QR, Ex. E-3 at 31-33 (discussing how the marginal price is calculated).  In any event, "[n]othing in the statute requires Commerce to consider how the authority acquired the good or service that was later provided to respondents."  *Nucor*, 2018 WL 895714, at *8.  KEPCO is "the exclusive supplier of electricity in Korea," GOK QR at 4, and, thus, Commerce's focus on KEPCO's costs and rate-setting method is reasonable.  *See, e.g.*, *Apex Frozen Foods*, 862 F.3d at 1351 (citation omitted).[58]

---

[57] The passage quoted by Nucor appears on page 32 of Hyundai Steel's Rebuttal Brief—not page 15.

[58] At oral argument, POSCO asserted that Nucor's argument that KPX undercompensates nuclear generators must fail because the record shows those generators to be profitable.  Oral Arg. at 2:32:31-2:34:10.  The court may not accept "*post hoc* rationalizations for agency action" and may only sustain the agency's decision "on the same basis articulated in the order by the agency itself."  *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168–69 (1962).  Thus, reasoning that is offered *post hoc*, in briefing to the court or during oral argument, is not properly part of this court's review of the agency's underlying determination when such reasoning is not discernable

### d.  Substantial Evidence Supports Commerce's Determination

In making its benefit determination, Commerce relied on evidence that KEPCO used a standard pricing mechanism to develop its tariff schedule, which was based upon, and covered, its costs and an amount for investment return.  I&D Mem. at 50 & nn.234-35 (citations omitted).  In particular, the record shows that KEPCO more than covered its cost of supplying industrial electricity for the POI.[59]  The evidence upon which Nucor seeks to rely does not undermine Commerce's determination because it contains mostly historical observations that predate the POI.  *See* Nucor Mot. at 31-33 (citing *Welded Line Pipe from the Republic of Korea,* 80 Fed. Reg. 61,365 (Dep't Commerce Oct. 13, 2015) (final neg. countervailing duty determination; 2013), and accompanying Issues and Decision Mem., C-580-877 (Oct. 5, 2015) ("*Welded Line Pipe from Korea*, I&D Mem.") at 14-15);[60] Petition, Exs. X-2 at ECF p. 39, X-11 at ECF p. 62, X-15 at ECF p. 107).

---

from the record itself.  Such reasoning is not discernible because Commerce did not consider KPX's costs relevant to the inquiry and, thus, did not consider or discuss this evidence.  *See* I&D Mem. at 50.

[59] KEPCO's "cost recovery rate" for its industrial tariff was [[     ]] percent.  GOK QR, Ex. E-23.

[60] Nucor points to Commerce's statement that "cross-subsidization" has existed in the Korea electricity market and that "[c]heap power significantly helped the export-led growth of the Korean economy, while nurturing an industry structure which consumes too much power and which cannot survive with a price that would recover costs."  Nucor Mot. at 31-32 (quoting *Welded Line Pipe from Korea*, I&D Mem. at 14-15). Notwithstanding its historical observation, therein, Commerce determined that the GOK's provision of electricity was not for less than adequate remuneration.  *Welded Line Pipe from Korea*, I&D Mem. at 18; *see also Maverick Tube*, 273 F. Supp. 3d at 1297 (affirming *Welded Line Pipe from Korea*).

Nucor also attempts to dismiss evidence of KEPCO's pre-POI tariff rate increases on the basis of speculative forecasts contained in KEPCO's Form 20-F filed with the U.S. Securities and Exchange Commission.  *See* Nucor Mot. at 32;[61] Nucor Reply at 19 (arguing that any contention that political intervention ended before the POI is belied by KEPCO's cautionary statements).  In fact, KEPCO raised its prices three times in 2012 and 2013.  *See* GOK QR, Ex. E-3 at 53; I&D Mem. at 51.  Nucor contends that the rate increases were insufficient in light of the fact that rates for industrial customers were almost 20 percent below generating costs before the increases took effect.  *See* Nucor Mot. at 33 (citing Petition, Ex. X-17).  However, Nucor points to the overall increases, and not the specific increases to industrial rates, which were higher, collectively totaling 16.8 percent.  *See* GOK QR, Ex. E-3 at 53.  Moreover, as stated above, record evidence relied upon by Commerce demonstrates that KEPCO more than covered its cost of supplying electricity to industrial users.  *See id.*, Ex. E-23.  Accordingly, substantial evidence supports the agency's conclusion that the GOK's provision of electricity was not for less than adequate remuneration.[62]

---

[61] Nucor relies on the following statement by KEPCO:
> [B]ecause the [GOK] regulates the rates we charge for the electricity we sell to our customers . . . our ability to pass on fuel and other cost increases to our customers is limited. . . . [KEPCO] cannot assure that any future tariff increase by the Government will be sufficient to fully offset the adverse impact on our results of operations from the current or potential rises in fuel costs.

Nucor Mot. at 32 (quoting GOK QR, Ex. E-3 at 5).

[62] Nucor also asserts that it presented an alternative calculation purportedly showing that, [[                                              ]]  Nucor Mot. at 35 (citing Nucor Case Br. at 30).  Nucor relied on [[

]]  *Id.* (citing same).  Nucor asserts that Commerce dismissed its calculation as a

### B. Commerce's Determination Not to Apply AFA to the GOK

#### 1. Parties' Contentions

Nucor contends that Commerce should have relied on adverse facts available with regard to the GOK for its "repeated failure to provide complete, accurate, and verifiable information on KEPCO's price-setting procedures and electricity generation costs."  Nucor Mot. 36.  According to Nucor, the GOK failed to fully respond to Commerce's request "for documentation of KEPCO's 'lengthy deliberative process' [that occurs prior to its application for a tariff increase]," which is important because the GOK "has intervened to prevent KEPCO from implementing commercially sufficient tariff rate increases."  *Id.* at 40-41.

The Government contends that Commerce correctly determined not to rely on adverse facts available with regard to the GOK because it "was able to use verified information" and "fully analyzed" the allegedly subsidized program using the GOK's questionnaire responses.  Gov. Resp. at 22 (quoting I&D Mem. at 42) (alteration omitted); *see also* Resp't Def.-Int. Resp. at 26-27.  The Government further contends

---

possible benchmark because it was drawn from pre-POI data.  *Id.* (citing I&D Mem. at 24).  Nucor asserts, however, that it did not present the calculation for the purpose of providing an alternative benchmark, but to show that KEPCO had failed to cover its costs.  *Id.* at 35-36.  Page 24 of the Issues and Decision Memorandum does not discuss Nucor's alternative calculation.  Commerce did discuss the National Assembly Report on pages 50-51, wherein the agency dismissed the relevance of the report as part of its discussion about cost recovery on the basis of its "flawed . . . methodology," and because the information in the report predates the POI by two years.  I&D Mem. at 50-51.  Commerce further noted that KEPCO's electricity tariff rates have increased three times since the date of the report.  *Id.* at 51 & n.236.  Commerce therefore adequately addressed Nucor's argument.

that it is for Commerce to decide "what information is relevant and necessary for its investigations."  Gov. Resp. at 22 (citing *Ansaldo Componenti,* 10 CIT at 37, 628 F. Supp. at 205).

Nucor responds that Commerce *did* determine that information regarding the GOK's interference was relevant and necessary, because it asked for it, and a *post hoc* finding that withheld information was not relevant or necessary cannot be sustained. Nucor Reply at 21-22.

### 2.  Analysis

Pursuant to 19 U.S.C. § 1677e, Commerce "*may* use an inference that is adverse to the interests of [an uncooperative] party."  19 U.S.C. § 1677e(b)(1)(A) (emphasis added).   The statute's use of the word "may" indicates that Commerce has discretion in this regard.  *See Cerro Flow Prods, LLC v. United States*, Slip Op. 14-84, 2014 WL 3539386, at *7 (CIT July 18, 2014) (citing *Timken U.S. Corp. v. United States*, 28 CIT 62, 84–85, 310 F. Supp. 2d. 1327, 1346 (2004) (analyzing the International Trade Commission's discretion to apply adverse inferences pursuant to the same statute)); *Tianjin Magnesium Int'l Co., Ltd. v. United States*, 36 CIT ___, ___, 844 F. Supp. 2d 1342, 1346 (2012) (citing *PAM, S.p.A. v. United States,* 582 F.3d 1336, 1340 (Fed. Cir. 2009)).  The issue of whether an interested party has cooperated to the best of its ability "amounts to a line-drawing exercise [that] is precisely the type of discretion [generally] left within the agency's domain."  *Ta Chen Stainless Steel Pipe Co., Ltd. v. United States*, 31 CIT 794, 812 (2007) (internal quotation marks, citation, and second alteration omitted).  The court's review of relevant case law has uncovered just one

instance where the CIT overturned Commerce's decision *not* to rely on adverse facts available.  *See Tianjin Magnesium*, 844 F. Supp. 2d at 1347-48 (remanding for Commerce to address respondent's submission of falsified records two months after Commerce determined they were false).  The instant case is readily distinguishable.

Here, Commerce determined that the GOK submitted timely and complete responses to its extensive and detailed questionnaires.  *See* I&D Mem. at 42; GOK QR; GOK Suppl. QR.  The GOK's responses included information on "KEPCO's rate setting methodology, cost recovery rates, investment return, [] profit information[, and] . . . usage data on all electricity users, including the top 100 industrial users of electricity." I&D Mem. at 42.  Commerce explained that it was able to verify the pertinent information, including "the data underlying the calculations used by KEPCO to set the electricity prices in effect during the POI[, and] . . . KEPCO's standard pricing mechanism and its application in the setting of industrial electricity tariffs."  *Id*. at 42 & n.199 (citing *CORE* Electricity Verification Report).  In sum, Commerce was able to "fully analyze this alleged program based upon the information provided by the GOK." *Id*. at 42 & n.200 (citing Prelim. Mem. at 30-34).

Nucor points to the GOK's purported "refusal to provide any information regarding the 'informal' consultation process" that precedes KEPCO's submission of an application for a tariff rate increase.  Nucor Mot. at 39.  The GOK, however, responded to Commerce's inquiries regarding these consultations relevant to the tariff rate schedules and proposed tariff increases.  *See* I&D Mem. at 42; GOK QR at 28-30, 34. Accordingly, the GOK did not withhold information, such that resort to the use of facts

available was necessary, let alone adverse facts available. *See* 19 U.S.C.

§ 1677e(a)(2)(A), (b)(1)(A); *Shandong Huarong Mach. Co., Ltd. v. United States*, 30 CIT

1269, 1301, 435 F. Supp. 2d 1261, 1289 (2006) ("Absent a valid decision to use facts

otherwise available, Commerce may not use an adverse inference") (affirming

Commerce's decision not to apply adverse facts available when the respondent had

supplied the necessary information).  Thus, Commerce's determination not to rely on

adverse facts available is supported by substantial evidence and is otherwise in

accordance with law.[63]  In sum, the court denies Nucor's motion.

## CONCLUSION AND ORDER

In accordance with the foregoing, it is hereby

**ORDERED** that Commerce's *Final Determination* is sustained with respect to

Commerce's use of the facts available with an adverse inference for POSCO's failure to

report cross-owned input suppliers and an FEZ-located R&D facility, as set forth in

Discussion Section I.A.1 and I.A.2; it is further

**ORDERED** that POSCO's challenge to Commerce's *Final Determination* with

respect to Commerce's use of adverse facts available in response to DWI's loan

reporting is moot, as set forth in Discussion Section 1.A.3; it is further

---

[63] Nucor contends that Commerce's refusal to use third-country or Korean benchmark data or reach the issue of specificity hinged on unlawful determinations, and, as such, the court should remand the matter with instructions to reconsider using a third-country benchmark and to address Nucor's specificity-related arguments.  Nucor Mot. at 41. Because Commerce's determination that the GOK's provision of electricity was not for less than adequate remuneration is lawful and supported by substantial evidence, these issues are moot.

**ORDERED** that Commerce's *Final Determination* is remanded with respect to Commerce's use of the highest calculated rates to determine POSCO's adverse facts available rate, as set forth in Discussion Section I.B; it is further

**ORDERED** that Commerce's *Final Determination* is sustained with respect to the agency's corroboration methodology, as set forth in Discussion Section I.C.2.a; it is further

**ORDERED** that, to the extent Commerce continues to use the 1.05 percent rate derived from *Washers from Korea* following reconsideration of its use of the highest rates as required by Discussion Section I.B, Commerce's *Final Determination* is sustained with respect to Commerce's corroboration of the 1.05 percent rate, as set forth in Discussion Section I.C.2.b; it is further

**ORDERED** that, in addition to Commerce's required reconsideration of the 1.64 percent rate derived from *Refrigerators from Korea* rate pursuant to Discussion Section I.B, Commerce's *Final Determination* is remanded with respect to Commerce's corroboration of the 1.64 percent rate, as set forth in Discussion Section I.C.2.b; it is further

**ORDERED** that Commerce's *Final Determination* is sustained with respect to all issues raised in Nucor's motion, as set forth in Discussion Section II; it is further

**ORDERED** that Commerce shall file its remand redetermination on or before June 6, 2018; it is further

**ORDERED** that the deadlines provided in USCIT Rule 56.2(h) shall govern thereafter; and it is further

**ORDERED** that any opposition or supportive comments must not exceed 6,000 words.


/s/      Mark A. Barnett
Mark A. Barnett, Judge


Dated: March 8, 2018
          New York, New York