NON-CONFIDENTIAL VERSION

# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

POSCO, *et al.*,

Plaintiffs,

and

AK STEEL CORPORATION, *et al.*,

Plaintiff-Intervenors,

v.

UNITED STATES,

Defendant,

and

STEEL DYNAMICS, INC., *et al.*,

Defendant-Intervenors.

Before: Hon. Mark A. Barnett,
Chief Judge

Consol. Court No. 16-00225

<u>NON-CONFIDENTIAL VERSION</u>

Business Proprietary Information
Removed from Pages 12 and 16

## <u>NUCOR CORPORATION'S COMMENTS IN OPPOSITION TO FINAL RESULTS OF REDETERMINATION PURSUANT TO COURT REMAND</u>

Alan H. Price, Esq.
Timothy C. Brightbill, Esq.
Robert E. DeFrancesco, III, Esq.
Laura El-Sabaawi, Esq.
Adam M. Teslik, Esq.

WILEY REIN LLP
1776 K Street, NW
Washington, DC 20006
(202) 719-7000

*Counsel to Nucor Corporation*

Dated: May 19, 2021

Consol. CIT Ct. No. 16-00225                                    NON-CONFIDENTIAL VERSION

# TABLE OF CONTENTS

Page

I.    INTRODUCTION .................................................................................................. 1

II.   BACKGROUND ................................................................................................... 1

III.  ARGUMENT ....................................................................................................... 4

      A.    Commerce's Remand Results Do Not Comply with the CAFC's
            Holding ...................................................................................................... 4

            1.    The Remand Results Articulate, But Do Not Properly Apply,
                  a Standard that Would Comply with the Statutory Adequate
                  Remuneration Standard ..................................................................... 4

            2.    The Final Determination Was an Analysis of Preferential
                  Rates .................................................................................................. 5

            3.    The Remand Results Do Not Consider the Actual Costs of
                  Electricity Generation and Supply .................................................... 9

IV.   CONCLUSION .................................................................................................. 17

Consol. CIT Ct. No. 16-00225                    NON-CONFIDENTIAL VERSION

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Maverick Tube Corp. v. United States,*
  273 F.Supp.3d 1293 (Ct. Int'l Trade 2017) ...........................................................................7

*Nucor v. United States,*
  286 F.Supp.3d 1364 (Ct. Int'l Trade 2018) .........................................................................13

*Nucor v. United States,*
  927 F.3d 1243 (Fed. Cir. 2019)....................................................................... *passim*

*POSCO v. United States,*
  977 F.3d 1369 (Fed. Cir. 2020)....................................................................... *passim*

*U.S. Steel Corp. v. United States,*
  33 CIT 1935 (2009) ...........................................................................................16

**Regulations**

19 C.F.R. § 351.511 ............................................................................................3

**Administrative Materials**

*Certain Corrosion-Resistant Steel Products from the Republic of Korea,*
  84 Fed. Reg. 11,749 (Dep't Commerce Mar. 28, 2019) .........................................................1

*Circular Welded Carbon Quality Steel Pipe from the People's Republic of China,*
  73 Fed. Reg. 31,966 (Dep't Commerce June 5, 2008) ..........................................................16

*Light-Walled Rectangular Pipe and Tube from the People's Republic of China,*
  73 Fed. Reg. 35,642 (Dep't Commerce June 24, 2008) .........................................................16

*Pure Magnesium and Alloy Magnesium from Canada,*
  57 Fed. Reg. 30,946 (Dep't Commerce July 13, 1992) ..........................................................6

*Pure Magnesium and Alloy Magnesium from Canada,*
  57 Fed. Reg. 47,619 (Dep't Commerce Oct. 19, 1992) ..........................................................8

*Welded Line Pipe from the Republic of Korea,*
  80 Fed. Reg. 61,365 (Dep't Commerce Oct. 13, 2015) ..........................................................7

I.   **INTRODUCTION**

On behalf of Nucor Corporation ("Nucor"), we respectfully submit the following comments on the Department of Commerce's ("Commerce") Final Results of Redetermination Pursuant to Ct. Remand Order in *POSCO v. United States*, Consol. Ct. No. 16-00225, Remand Mandate from CAFC Ct. No. 19-1213 (Apr. 19, 2021), ECF No. 135 ("Remand Results").

II.   **BACKGROUND**

These remand proceedings arise from the decision of the Court of Appeals for the Federal Circuit ("CAFC") in *POSCO v. United States*, 977 F.3d 1369 (Fed. Cir. 2020) ("*POSCO CAFC*"). In *POSCO CAFC*, the court held that Commerce's final determination with respect to the Government of Korea's ("GOK") alleged provision of electricity for less than adequate remuneration ("LTAR") in the countervailing duty investigation of *Certain Cold-Rolled Steel Flat Products from the Republic of Korea*, 81 Fed. Reg. 49,946 (Dep't Commerce July 29, 2016), P.R. 450, and accompanying Issues and Decision Memorandum, P.R. 438 ("Final Determination"), was unlawful and unsupported by substantial evidence.

*POSCO CAFC* was the second case in which the CAFC addressed Commerce's application of the "standard pricing mechanism" analysis to determine whether the GOK provided electricity to Korean steel producers for LTAR.  The first, *Nucor Corp. v. United States*, 927 F.3d 1243 (Fed. Cir. 2019) ("*Nucor CAFC*"), sustained Commerce's final determination in *Certain Corrosion-Resistant Steel Products from the Republic of Korea*, 84 Fed. Reg. 11,749 (Dep't Commerce Mar. 28, 2019) and accompanying Issues and Decision Memorandum.  The *Nucor CAFC* court rejected Commerce's argument that an analysis of "preferential rates" may suffice under the "adequate remuneration" standard in the current statute.  *Nucor CAFC*, 927 F.3d at 1249.  The court nevertheless sustained Commerce's final determination, holding that Commerce also found "that

1

KEPCO's pricing met familiar standards of cost recovery" and that Nucor showed "no reversible error in Commerce's decision to rely on that combination of facts as sufficient to meet the 'adequate remuneration' standard." *Id.* at 1254.  The court's holding was "limit{ed}…to saying that Nucor has not supplied a persuasive reason to conclude that Commerce's finding of cost recovery in this case was either legally incorrect or factually unsupported." *Id.* at 1255.

In reaching this holding, the court declined to consider Nucor's argument that Commerce erred in limiting its analysis to the price that KEPCO paid to purchase electricity from wholly owned affiliates through the Korea Power Exchange ("KPX"). *Id.*  The court "agree{d} with the Court of International Trade {'CIT'} that this argument is in substance a contention that KPX is part of KEPCO as the 'authority' whose prices Commerce had to analyze," and that "Nucor failed to exhaust this argument at the agency level...." *Id.*

In *POSCO CAFC*, however, the court noted that "{t}he government does not raise an exhaustion argument in this case" and "conclude{ed} that Nucor preserved this issue for appeal." *POSCO CAFC*, 977 F.3d at 1377.  The court held that "the administrative record does not support Commerce's determination that KEPCO is the only relevant entity for purposes of analyzing costs," and that "it {is} implausible that Commerce adequately investigated Korea's prevailing market condition for electricity without a thorough understanding of the costs associated with generating and acquiring that electricity." *Id.*  "Commerce's failure to investigate and include KPX's generation costs in its analysis" thus "renders its final determination unsupported by substantial evidence." *Id.* at 1378.

In both *Nucor CAFC* and *POSCO CAFC*, the CAFC held that an analysis of preferential rates alone does not comply with the adequate remuneration standard.  In *Nucor CAFC*, Commerce defended its determination in part by arguing "that it suffices for compliance with the statutory

278a66bf27a31931

and regulatory standard...that the foreign government authority not be charging the producer at issue 'a preferential rate,'" or a "rate {that} is set by a 'consistent and discernible method' and does not reflect 'price discrimination.'" *Nucor CAFC*, 927 F.3d at 1249.  The court rejected this position and held that it was "unreasonable to deem mere lack of discrimination sufficient to establish adequacy of remuneration, as Commerce's broad position does." *Id.* at 1250.

The court reasoned that the statute "convey{s} a familiar notion of payment of an amount that reflects the value of what is being paid for...." *Id.*  This meaning applies to each tier of Commerce's adequate remuneration regulation at 19 C.F.R. § 351.511 because it "sensibly treats the three methods as all of a piece," reflecting "competitive-market prices, which...are tied to 'fair value.'" *Id.* at 1253.  The court explained further that "{n}o different conclusion is suggested by the command that adequacy be determined 'in relation to prevailing market conditions.'... At most it directs attention to any competitive-market prices, as reflected in Commerce's regulation making market prices the primary tool of analysis if available, and to the complex of 'conditions' relevant to assessing prices charged...." *Id.* at 1251.  The *POSCO CAFC* court incorporated the *Nucor CAFC* court's holdings.  *POSCO CAFC*, 977 F.3d at 1375.

The CAFC issued its mandate on December 7, 2020.  Mandate (Dec. 7, 2020), ECF No. 130, and this Court remanded to Commerce for redetermination consistent with *POSCO CAFC*.  Scheduling Order (Dec. 21, 2020), ECF No. 133.  Commerce issued its draft remand results on March 10, 2021 and continued to find that the GOK's provision of electricity to the respondents was not for LTAR and thus conferred no benefit.  Remand P.R. 1.  Nucor filed comments on the draft remand results on March 16, 2021, arguing that Commerce had failed to address the holdings in *POSCO CAFC* and that the draft remand results remained unlawful and unsupported by substantial evidence.  Remand P.R. 4, C.R. 1.  Commerce filed the Remand Results on April 19,

2021.  In the Remand Results, Commerce again determined that the GOK's provision of electricity was not for LTAR and thus did not confer a benefit.

## III.   ARGUMENT

### A.   Commerce's Remand Results Do Not Comply with the CAFC's Holding

#### 1.   The Remand Results Articulate, But Do Not Properly Apply, a Standard that Would Comply with the Statutory Adequate Remuneration Standard

In responding to Nucor's comments, the Remand Results articulate a tier-three methodology that would comply with the adequate remuneration standard if properly applied.  In the Remand Results, Commerce explains that "{w}e do not disagree that 'cost recovery' is a vital part of an adequacy of remuneration analysis.  In fact, our analysis under the standard methodology is 'cost recovery' plus 'a return on investment or profit.'"  Remand Results at 28.  "In other words," Commerce explains,

> if the tariff charged to the respondent does not cover "cost of production" plus "a profitable return on the investment"...then the respondent has received a countervailable benefit under section 771(5)(E) of the Act.  Moreover, even in the event that the tariff charged to the respondent covers "costs of production" plus "a profitable return on the investment," there is still a countervailable benefit conferred under the statute if {the government supplier} charges the respondent less than what they should be charged...."

*Id.* at 31.

Nucor agrees that this methodology, as stated, would apply the tier-three benchmark regulation in a manner that is consistent with the requirements of the adequate remuneration standard.  A government price that covers the cost of production and supply, plus an amount for profit, and that is not otherwise less than the respondent should be charged, would be consistent with market principles and thus a lawful benchmark under the post- Uruguay Round Agreements Act statute.  It would adequately address the CAFC's holdings in *POSCO CAFC*.  And it would

be consistent with Nucor's position before the agency in the original investigation. *See, e.g.*, P.R.
414, C.R. 461 at 15-16 (arguing that the statute requires a "market based" benchmark price and
that a price below the cost of production would not satisfy that requirement).

However, the Remand Results fail to actually apply this standard in accordance with the
CAFC's holdings in *POSCO CAFC*. First, this is not the analysis that the agency applied in the
Final Determination of the original investigation, as the Remand Results assert. Simply asserting
that the legal standard applied in the Final Determination was correct is therefore insufficient.
Second, the Remand Results do not address the CAFC's holdings regarding the flaws in the Final
Determination's cost analysis because they do not consider the actual costs of generation and
supply. Finally, any additional cost-plus-profit analysis in the Remand Results considers KEPCO
as a whole and the broader tariff class applicable to the respondents. Commerce does not
determine that the prices actually paid by the respondents covered the cost of supply and an amount
for profit.

### 2. The Final Determination Was an Analysis of Preferential Rates

The Remand Results suggest that the Final Determination relied on the standard noted
above. According to the Remand Results, "consistent with the prevailing market conditions in
Korea, Commerce first analyzed whether KEPCO's tariff rates covered its cost plus a return on
investment," Remand Results at 11-12, and then considered whether the respondents were charged
the appropriate rate under the tariff schedule for their consumption characteristics. *Id.* at 16. *See
also id.* at 30-31. Commerce references the rule that the Final Determination drew from the 1992
investigation of *Magnesium from Canada – i.e.*, "if the rate charged is consistent with the standard
pricing mechanism and the company under investigation is, in all other respects, essentially treated
no differently than other companies which purchase comparable amounts of electricity, then there

is no benefit" – and asserts that this "was, in fact, not the basis for Commerce's adequacy of remuneration analysis." *Id.* at 10-11.  According to the agency, Commerce instead "relied on the fact that KEPCO fully covered its cost in the industrial rates charged to the respondent steel companies." *Id.* at 11.

The Final Determination, however, relied on the standard pricing mechanism analysis drawn from *Magnesium from Canada*.  There, Commerce explained that its "definition of preference does not require that all users pay identical prices.  In the case of electricity, where users can be categorized according to different use characteristics, a finding of no preference requires that similarly situated users pay the same rate." *Pure Magnesium and Alloy Magnesium from Canada*, 57 Fed. Reg. 30,946, 30,954 (Dep't Commerce July 13, 1992) (emphasis added). Commerce found that "{i}f the rate charged is consistent with the standard pricing mechanism and the company under investigation is, in all other respects, essentially treated no differently than other industries which purchase comparable amounts of electricity, we would probably not find a countervailable subsidy." *Id.* at 30,950.

This is the rule that Commerce relied upon in the Final Determination.  Commerce explained that "{i}f the rate charged is consistent with the standard pricing mechanism and the company under investigation is, in all other respects, essentially treated no differently than other companies which purchase comparable amounts of electricity, then there is no benefit."  Final Determination at 46.  It emphasized that a finding of this nature "is sufficient to support a finding that no benefit is conferred{,}" and that the "argument...that a preferentiality analysis cannot be sufficient to assess adequate remuneration is mistaken." *Id.* at 47-48 (emphasis added).  The agency thus concluded that "this program provides no benefit to POSCO and Hyundai Steel because the prices charged to these respondents under the applicable industrial tariff {rate} were

consistent with KEPCO's standard pricing mechanism." *Id.* at 46.  Commerce applied the same

test and reached the same conclusion in the *Welded Line Pipe from Korea* investigation, where

there was no evidence of cost recovery on the record and no such finding was made.  *See* Issues

and Decision Memorandum accompanying *Welded Line Pipe from the Republic of Korea*, 80 Fed.

Reg. 61,365 (Dep't Commerce Oct. 13, 2015) at 17-18.  *See also Maverick Tube Corp. v. United*

*States*, 273 F.Supp.3d 1293, 1310 (Ct. Int'l Trade 2017).

 The one-sentence observation that "KEPCO more than fully covered its cost for the

industry tariff applicable to our respondents" was not a "comprehensive analysis of KEPCO's

costs...." Remand Results at 11, 14.  It was an off-handed aside at the end of an extended argument

disclaiming any obligation to consider cost recovery in any manner.  Final Determination at 48-

50.  The assertion that Commerce "relied on the fact that KEPCO fully covered its cost in the

industrial rates charged to the respondent steel companies" mischaracterizes the Final

Determination.  Remand Results at 11.

 Commerce's similar attempt to present the *Magnesium from Canada* analysis as one of

adequate remuneration under the preferential rates framework does not remedy the Final

Determination's flaws.  *See* Remand Results at 26-27.  According to the agency, in *Magnesium*

*from Canada* "Commerce examined the government-owned utility company's price setting

mechanism and determined that one of the guiding principles in the setting of the utility company's

rates is that in establishing electricity tariffs, the rates must reflect the costs of supply associated

with each of its various rate categories." *Id.*  As a result, "the current methodology involving the

standard pricing mechanism was developed as a distinct and separate methodology from the

previous preferentiality methodology." *Id.* at 27.

The benefit determination in *Magnesium from Canada*, however, did not turn on whether the prices paid by the respondent covered the government supplier's costs plus a reasonable amount for profit. Rather, it turned on whether "over the life of the {respondent's} contract, one could reasonably expect that the price charged would yield a revenue stream consistent with the power company's standard pricing mechanism for purchasers of comparable quantities of electricity." *Magnesium from Canada*, 57 Fed. Reg. at 30,950. In the changed circumstances review, Commerce found no benefit under the respondent-specific contract because "the revenue Hydro Quebec can expect to receive under the amended contract is consistent with the rate of return and rate setting principles" applicable to all users. *Pure Magnesium and Alloy Magnesium from Canada*, 57 Fed. Reg. 47,619 (Dep't Commerce Oct. 19, 1992). In other words, there was no benefit because the respondent was paying the same amount as other users over the life of the contract, not because that amount reflected the fair market value of the input and the supplier's costs plus a reasonable rate of profit. As stated earlier, this is the same incorrect analysis that the CAFC has properly struck down.

Likewise, in the Final Determination here, Commerce found no benefit because the respondents' rates were consistent with KEPCO's standard pricing mechanism and because the respondents were otherwise treated no differently than similarly situated users. It did not find that there was no benefit because the rates that the respondents paid were cost-plus-profit prices and were not otherwise lower than what the respondents should have paid.

Regardless, even if the court agrees with the agency's characterization of the "standard pricing mechanism" analysis as requiring that the government supplier charge a price that covers costs and amount for profit, Commerce did not comply with the CAFC's holdings regarding a proper analysis of costs in this case.

    **3.      The Remand Results Do Not Consider the Actual Costs of Electricity Generation and Supply**

In the underlying investigation, Nucor argued (i) that "the Korean Government, through the {KPX} Cost Evaluation Committee, sets the value of each variable that goes into determining the prices at which generators may bid to sell electricity at the KPX," (ii) that "{t}he accuracy of the prices the Cost Evaluation Committee assigns to different generation sources is therefore paramount to evaluating whether steel producers obtain their electricity 'according to market principles,'" and (iii) that the Cost Evaluation Committee's cost assignments were distorted and did not reflect the true cost of generating and supplying electricity.  P.R. 414, C.R. 461 at 25-28. Commerce, however, did not look beyond KEPCO's purchase price through the KPX because KEPCO's "costs for electricity are based upon the purchase price of electricity from the KPX, and this is the cost that is relevant for KEPCO's industrial tariff schedule."  Final Determination at 50.

In *POSCO CAFC*, the CAFC remanded this aspect of the Final Determination. It held that "Commerce's failure to investigate and include KPX's generation costs in its analysis renders its final determination unsupported by substantial evidence." *POSCO CAFC*, 977 F.Supp.3d at 1378. The court rejected Commerce's argument that "nothing in the statute requires Commerce to consider how the authority acquired the good or service that was later provided to respondents." *Id.* at 1377.  The court pointed to three provisions of the statute that require Commerce to expand its findings beyond the "limited analysis" of KEPCO's cost of purchasing electricity.  *Id.* at 1376-78.

First, the court said, "Commerce has an affirmative duty to investigate any appearance of subsidies related to the investigation that are discovered during an investigation."  *Id.* at 1378. Second, "Section 1677(5) requires Commerce to evaluate subsidies 'without regard to whether the

subsidy is provided directly or indirectly on the manufacture, production, or export of merchandise...."  *Id.*  Third, the statute "requires Commerce to consider the adequacy of remuneration 'in relation to prevailing market conditions." *Id.*

The Remand Results do not remedy the Final Determination's flaws with respect to the KPX and the true costs of generating and supplying electricity.

> ### a.    The Remand Results Unlawfully Construe the "Prevailing Market Conditions" as Limited to KEPCO's Pricing Methodology

The CAFC held that that "it {is} implausible that Commerce adequately investigated Korea's prevailing market condition for electricity without <u>a thorough understanding of the costs associated with generating and acquiring electricity</u>."  *Id.* at 1377 (emphasis added).  In an investigation of the Korean electricity market, Commerce must view the "prevailing market conditions" broadly enough to encompass the market through which "all electricity generated in Korea must be sold...."  *Id.*  In an investigation of how electricity prices are established in the Korean market, the "prevailing market conditions" must be broad enough to encompass the entity "with responsibilities for setting the price of electricity {in} the electricity market in Korea."  P.R. 147-218, C.R. 108-112, 114-217 at Exhibit E-2, p. 30.

The Remand Results are thus unlawful inasmuch as they treat the "prevailing market conditions" in the Korean electricity market as coextensive with KEPCO's rate setting methodology.  According to the Remand Results, KEPCO's "method of establishing different tariff classifications based upon price, marketability, transportation and other conditions of purchase or sale constitutes prevailing market conditions within the meaning of section 771(5)(E)(iv) of the Act."  Remand Results at 12.  The Remand Results add that KEPCO's "tariff classifications delineated by electricity contract demand, voltage, usage pattern of electricity, and

volume of electricity consumed all fall within the statutory definition of adequate remuneration...which states that 'prevailing market conditions include price, quality, availability, marketability, transportation and other conditions of purchase or sale." *Id.* at 15.  The Remand Results state that "Commerce analyzed whether the price charged to the respondents was consistent with market principles and prevailing market conditions in Korea in the form of the tariff classifications established by KEPCO." *Id.* at 14.

The Remand Results thus treat the "prevailing market conditions" in Korea as coextensive with "the tariff classifications established by KEPCO" and do not expand the analysis to include additional information regarding the KPX or actual generation costs.  Instead, they assert that certain questions posed to the GOK in the initial questionnaire were sufficient to address the *POSCO CAFC* court's holdings.  *See id.* at 17.  These questions, however, were limited to requesting information regarding KEPCO's cost of purchasing electricity through the KPX.  The first question asked the Korean government whether "the price paid {by KEPCO} is sufficient to cover all the costs including an amount for investment return," while the second related to the "price adjustment coefficient," which adjusts the prices that KEPCO pays and is irrelevant to the actual costs of generating and supplying electricity.  P.R. 147-218, C.R. 108-112, 114-217 at 31-33.

The *POSCO CAFC* court was aware that Commerce requested this information regarding KEPCO's costs of purchasing electricity through the KPX.  *POSCO CAFC*, 977 F.3d at 1377-78.  It held that this was insufficient given the structure of the transactions and the nature of the relationships among KEPCO, the KPX, and KEPCO's generation subsidiaries.  *Id.*  The Korean government's responses to those questions do not address the evidentiary deficiencies underlying the *POSCO CAFC* court's holdings.  With respect to cost recovery, the Korean government simply

asserted that "[

]."  P.R. 147-

218, C.R. 108-112, 114-217 at 32.  The Korean government provided no data to support this claim

or any reference to prices actually paid by the respondents.

In its comments on the Korean government's questionnaire response, Nucor pointed out

that "{t}he KPX price that KEPCO pays is supposedly 'principally based on the cost of generating

electricity,' but these costs are actually determined on a monthly basis by the KPX itself, through

a 'Cost Evaluation Committee' made up of representatives from MOTIE, the KPX, KEPCO, and

the generation companies."  P.R. 315, C.R. 378 at 14.  *See also* P.R. 414, C.R. 461 at 24-25.  This

raised questions regarding "why an objective number like a generator's variable cost must be

'determined' by an outside committee comprised of government officials and the monopoly

purchaser that ultimately pays whatever price emerges as a result of the Cost Evaluation

Committee's intervention."  P.R. 315, C.R. 378 at 14.  Nucor thus asked Commerce to request

additional information and data regarding the Cost Evaluation Committee and transactions among

KEPCO, the KPX, and electricity generators, *id.* at 14-15, none of which were incorporated into

the supplemental questionnaires.  *See* Final Determination at 50 (explaining that Commerce "did

not request these costs....").

Nucor also pointed to substantial evidence that KEPCO's acquisition cost through the KPX

did not reflect the full cost of generation, even based on costs assigned by the Cost Evaluation

Committee.  P.R. 315, C.R. 378 at 15-17; P.R. 324, C.R. 381 at 7-10; P.R. 414, C.R. 461 at 23-32.

Nucor asked Commerce to request additional information regarding the actual costs of generating

and supplying electricity, P.R. 315, C.R. 378 at 15-17; P.R. 324, C.R. 381 at 7-10, none of which

were incorporated into the supplemental questionnaires.  *See* Final Determination at 50 (explaining

that Commerce "did not request these costs...."). The generators' actual cost data is provided to the Cost Evaluation Committee on a monthly, quarterly, and annual basis under Korean law and was therefore available to the Korean government. P.R. 147-218, C.R. 108-112, 114-217 at Exhibit KPX-1, p. 6. But Commerce chose not to ask for it.

On appeal, the CAFC held that this choice constituted reversible error because it is "implausible that Commerce adequately investigated Korea's prevailing market condition for electricity without a thorough understanding of the costs associated with generating and acquiring that electricity." *POSCO CAFC*, 977 F.3d at 1377. Because the Remand Results include no additional information or analysis regarding the actual costs of generating and supplying electricity, they fail to address this aspect of the CAFC's holdings.

> **b.** **The Remand Results Fail to Consider the KPX and Electricity Generators as Part of the Relevant Authority**

The CAFC also held that Commerce erred by ignoring evidence that the KPX was itself an "authority" relevant to the investigation. *Id.* at 1378. This aspect of the court's holding should be read in the context of Commerce's arguments and the court's holdings regarding the KPX in *Nucor CAFC*. Before the CIT in *Nucor Corp. v. United States*, Commerce "argued that Nucor and Plaintiff-Intervenors did not raise at the agency level the argument that, because the KPX was owned by KEPCO, the KPX should be considered part of the relevant authority." *Nucor Corp. v. United States*, 286 F.Supp.3d 1364, 1377 (Ct. Int'l Trade 2018) (emphasis added). The CIT agreed with Commerce and held that Nucor "did not argue at the agency level that, as a result of the corporate ownership structure, KPX should be treated as part of the relevant authority." *Id.* (emphasis added).

Nucor challenged this holding in *Nucor CAFC*.  The *Nucor CAFC* majority, however, concurred with the CIT.  *Nucor CAFC*, 927 F.3d at 1255-56.  In dissent, Judge Reyna disagreed, finding that "Nucor's arguments as to the relevance of KPX's costs and its role in providing a subsidy could hardly have been more explicit.  Absent expressly using the word 'authority' in describing KPX, Nucor did more than enough to raise these issues before Commerce; it made persuasive arguments."  *Id.* at 1261 (Reyna, J. dissenting).  The exhaustion ruling was "a mere semantic formality...that deprive{d} Nucor of its day in court...."  *Id.*  Writing for the court in *POSCO CAFC*, Judge Reyna noted that there were no exhaustion issues and held that Commerce erred, in part because it did not consider whether the KPX was an "authority" by virtue of its position within KEPCO's corporate structure.  *POSCO CAFC*, 977 F.3d at 1378.

The Remand Results attempt to transform this holding into an upstream subsidy issue.  *See* Remand Results at 17-18.  No upstream subsidy allegation was made during the investigation, and no such arguments were raised on appeal.  The Remand Results suggest that Commerce has never disputed the KPX's "authority" status and attempt to justify the Final Determination's treatment of the KPX as irrelevant because there was purportedly "no information on the record to support the conclusion that KPX's pricing of electricity provided a benefit as both defined and required by the statute."  Remand Results at 8-9.  As a result, "Commerce did not initiate an investigation on the pricing of electricity between KPX and KEPCO."  *Id.*  *See also id.* at 17-18 (citing to upstream subsidy determination in subsequent administrative reviews).

This reasoning is irrelevant to the CAFC's holdings.  The question is not whether Commerce improperly declined to initiate an upstream subsidy investigation.  The question is whether Commerce improperly ignored KPX in investigating whether KEPCO's prices conferred

a benefit to the respondents.  References to Commerce's upstream subsidy findings in subsequent administrative reviews are inapposite.

Commerce argued before the CIT and CAFC in the *Nucor* appeals that its decision was justified because Nucor did not properly argue that the KPX was <u>a part of KEPCO</u> the "authority," and the courts declined to consider Nucor's arguments based on this defense.  The Remand Results now reverse course and concede that the KPX is, and apparently always has been, part of KEPCO the "authority" for the purpose of Commerce's analysis.  The KPX is thus an integral part of the "authority" under investigation, and its role in that authority's price-setting process must be thoroughly examined in accordance with the CAFC's holdings in *POSCO CAFC*.

> c.  **Any Additional Analysis in the Remand Results Unlawfully Considers KEPCO in the Aggregate**

To the extent that the Remand Results attempt to cite additional evidence that KEPCO's prices to the respondents reflect the full cost of generation and supply plus an amount for profit, they do so only with respect to KEPCO in the aggregate.  *See* Remand Results at 38-39. Referencing KEPCO's Form 20-F for the POI, the Remand Results find that "the KPX unit price more than covered the fuel costs for each of these generators," that "KEPCO, as a consolidated entity, was profitable," and that "KEPCO's generation subsidiaries were profitable in 2014...." *Id.* at 39.

A finding that KEPCO or KEPCO's generation subsidiaries were profitable on all sales to all users does not support a determination that KEPCO's prices to the respondents reflected adequate remuneration.  Commerce has previously rejected arguments that a government supplier's overall profitability suggests that prices to the respondents represent adequate remuneration.  *See, e.g.*, Issues and Decision Memorandum accompanying *Circular Welded*

*Carbon Quality Steel Pipe from the People's Republic of China*, 73 Fed. Reg. 31,966 (Dep't Commerce June 5, 2008) at 65 ("We agree with {Petitioners}...that the profitability of Chinese HRS producers is not relevant to the determination of whether HRS was sold for LTAR."); Issues and Decision Memorandum accompanying *Light-Walled Rectangular Pipe and Tube from the People's Republic of China*, 73 Fed. Reg. 35,642 (Dep't Commerce June 24, 2008) at 36 ("{T}he profitability of SOE HRS producers...is not relevant to the determination of whether HRS was sold for LTAR."). The CIT has also rejected such arguments. *U.S. Steel Corp. v. United States*, 33 CIT 1935, 1944 n.10 (2009) ("The overall profitability of the NMDC does not demonstrate that its prices to Essar are market-based.").

Nucor argued during the original investigation that KEPCO's pricing structure "creates *de facto* cross-subsidization, though which the majority of society...pays the highest government-assigned prices in order to cover the fixed costs that are excluded from the government-assigned prices paid to generators supplying electricity to off-peak, industrial consumers" like the mandatory respondents in the investigation. P.R. 414, C.R. 461 at 27-28. Nucor showed that the respondents purchased electricity [                                        ], when [

                                                                    ]. *See id.* at

30-31; P.R. 120-138, C.R. 58-102 at Exhibit A-2 (showing [

          ]; P.R. 219-239, C.R. 218-255 at Exhibit A-1 (showing [

          ]); Remand Results at 39 n.139 (showing that the lowest cost generator sold electricity through the KPX at a unit price of KRW 59.95).[1] Whether KEPCO or its generation subsidiaries in the

---

[1]     As noted above, these prices through the KPX are established by costs assigned to generators by the Cost Evaluation Committee and thus do not represent the <u>actual costs</u> of generating and supplying electricity.

NON-CONFIDENTIAL VERSION

aggregate were profitable on all sales to all users ignores this dynamic and is irrelevant to KEPCO's subsidization of the respondents under investigation.

The Remand Results thus do not comply with the holdings of *POSCO CAFC* because they do not determine whether the prices paid by the respondents reflected the actual costs of generating and supplying electricity, plus a reasonable amount for profit.

## IV.   <u>CONCLUSION</u>

For these reasons, Nucor respectfully requests that the Court find that Commerce's Remand Results remain unlawful and unsupported by substantial evidence and remand for the agency to comply with the holdings of *POSCO CAFC*.

Respectfully submitted,

*/s/ Timothy C. Brightbill*
Alan H. Price, Esq.
Timothy C. Brightbill, Esq.
Robert E. DeFrancesco, III, Esq.
Laura El-Sabaawi, Esq.
Adam M. Teslik, Esq.

**WILEY REIN LLP**
1776 K Street, NW
Washington, DC 20006
(202) 719-7000

*Counsel to Nucor Corporation*

Dated: May 19, 2021

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Chamber Procedure 2(B)(l) and the Scheduling Order (Dec. 21, 2020), ECF No. 133, the undersigned certifies that these comments comply with the word limitation requirement. The word count for Nucor Corporation's Comments in Opposition to Final Results of Redetermination Pursuant to Court Remand, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2019), is 4,940 words.

*/s/ Timothy C. Brightbill*
(Signature of Attorney)

Timothy C. Brightbill
(Name of Attorney)

Nucor Corporation
(Representative Of)

May 19, 2021
(Date)